**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHONG YIM; MARILYN YIM;
KELLY LYLES; EILEEN, LLC;
RENTAL HOUSING ASSOCIATION
OF WASHINGTON,

*Plaintiffs-Appellants,*

v.

CITY OF SEATTLE, a Washington
municipal corporation,

*Defendant-Appellee.*

No. 21-35567

D.C. No.
2:18-cv-00736-
JCC

OPINION

Appeal from the United States District Court
for the Western District of Washington
John C. Coughenour, District Judge, Presiding

Argued and Submitted May 17, 2022
Seattle, Washington

Filed March 21, 2023

Before: Kim McLane Wardlaw, Ronald M. Gould, and
Mark J. Bennett, Circuit Judges.

Opinion by Judge Wardlaw;
Concurrence by Judge Wardlaw;
Partial Concurrence by Judge Bennett;
Partial Concurrence and Partial Dissent by Judge Gould

## SUMMARY[*]

### First Amendment Speech / Due Process

The panel reversed in part and affirmed in part the district court's judgment upholding the constitutionality of the City of Seattle's Fair Chance Housing Ordinance, which prohibits landlords from inquiring about the criminal history of current or potential tenants and from taking adverse action, such as denying tenancy, against them based on that information.

Plaintiffs are landlords who filed an action against the City, alleging violations of their federal and state rights of free speech and substantive due process. The district court held that the Ordinance regulates speech, not conduct, and that the speech it regulates is commercial speech. The district court applied an intermediate level of scrutiny to hold that the Ordinance was constitutional as a "reasonable means of achieving the City's objectives and does not burden substantially more speech than is necessary to achieve them."

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel did not decide whether the Ordinance regulates commercial speech and calls for the application of intermediate scrutiny, or whether the Ordinance regulates non-commercial speech and is subject to strict scrutiny review, because it concluded that the Ordinance did not survive the intermediate scrutiny standard of review. The panel held that the Ordinance's inquiry provision impinged upon the First Amendment rights of landlords. The City's stated interests—reducing barriers to housing faced by persons with criminal records and the use of criminal history as a proxy to discriminate on the basis of race—were substantial. The panel disagreed with the district court that the Ordinance was narrowly drawn to achieve the City's stated goals. Here, the inquiry provision—a complete ban on any discussion of criminal history between the landlords and prospective tenants—was not in proportion to the interest served by the Ordinance in reducing racial injustice and reducing barriers to housing. The panel therefore concluded that the inquiry provision failed intermediate scrutiny.

The panel rejected the landlords' claim that the adverse action provision of the Ordinance violated their substantive due process rights because the landlords did not have a fundamental right to exclude, and the adverse action provision survived rational basis review. Because the Ordinance contains a severability provision, the panel remanded the case to the district court to determine whether the presumption of severability was rebuttable and for further proceedings.

Judge Wardlaw concurred. While the majority assumes, but does not decide, that the Ordinance regulates commercial speech, she would agree with the district court that the speech it regulates is commercial speech. Applying the

three-factor test in *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60 (1983), she would hold that the Ordinance regulates commercial speech and is subject to an intermediate standard of review, which it fails to survive.

Judge Bennett concurred in the majority opinion, except for Part III.B.i and footnote 16, and concurred in the result. He wrote separately because under *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011), he would hold that strict scrutiny applies because the Ordinance, on its face, is a content- and speaker-based restriction on *noncommercial* speech, and the Ordinance fails strict scrutiny.

Judge Gould concurred in part and dissented in part. He concurred in Parts I, II, III(A), III(B)(i), and IV of the majority opinion. He agreed with Judge Wardlaw that Seattle's inquiry provision regulates commercial speech and is subject to intermediate scrutiny. He dissented from the majority's conclusion that the inquiry provision is not narrowly tailored, and from the resulting judgment that the provision is unconstitutional. He would instead hold that the inquiry provision survives intermediate scrutiny and affirm the district court in full.

## COUNSEL

Ethan W. Blevins (argued) and Brian T. Hodges, Pacific Legal Foundation, Sacramento, California; James M. Manley, Pacific Legal Foundation, Phoenix, Arizona; for Plaintiffs-Appellants.

Roger D. Wynne (argued) and Sara O'Connor-Kriss, Attorneys, Seattle City Attorney's Office, Seattle,

Washington; Jessica L. Goldman, Summit Law Group PLLC, Seattle Washington; for Defendant-Appellee.

Jennifer L. Sarvadi (argued) and Rebecca E. Kuehn, Hudson Cook LLP, Washington, D.C., for Amici Curiae Consumer Data Industry Association and Professional Background Screening Association.

Ilya Shapiro, Trevor Burrus, and Sam Spiegelman, Cato Institute, Washington, D.C., for Amicus Curiae Cato Institute.

Jill D. Bowman, Stoel Rives LLP, Seattle, Washington, for Amicus Curiae GRE Downtowner LLC.

Victoria Wong and Manu Pradhan, Deputy City Attorneys; David Chiu, City Attorney; San Francisco City Attorney's Office, San Francisco, California, for Amici Curiae International Municipal Lawyers Association and City and County of San Francisco.

Eric Dunn, National Housing Law Project, Richmond, Virginia, for Amici Curiae National Housing Law Project, Shriver Center on Poverty Law, Tenant Law Center, Formerly Incarcerated & Convicted People and Families Movement, and Just Cities Institute.

Nick Allen and Ashleen O'Brien, Columbia Legal Services, Seattle, Washington; Melissa R. Lee and Robert S. Chang, Ronald A. Peterson Law Clinic, Seattle, Washington; Breanne Schuster, ACLU of Washington Foundation, Seattle, Washington; for Amici Curiae Pioneer Human Services, Tenants Union of Washington, Fred T. Korematsu Center for Law and Equality, and ACLU of Washington.

**OPINION**

WARDLAW, Circuit Judge:

In 2017, the City of Seattle enacted the Fair Chance Housing Ordinance, Seattle, Wash., Municipal Code (S.M.C.) § 14.09, *et seq*. (2017) (Ordinance). The Ordinance prohibits landlords from inquiring about the criminal history of current or potential tenants, and from taking adverse action, such as denying tenancy, against them based on that information.

Shortly after the Ordinance was passed, Plaintiffs, several landlords who own small rental properties and a landlord trade association that provides background screening services, filed this action against the City, alleging violations of their federal and state rights of free speech and substantive due process. On cross-motions for summary judgment, the district court upheld the constitutionality of the Ordinance.

We conclude that the Ordinance's inquiry provision impinges upon the First Amendment rights of the landlords, as it is a regulation of speech that does not survive intermediate scrutiny. However, we reject the landlords' claim that the adverse action provision of the Ordinance violates their substantive due process rights. The landlords do not have a fundamental right to exclude, and the adverse action provision survives rational basis review. We therefore affirm in part and reverse in part the district court's order. Because the Ordinance contains a severability provision, we remand this case to the district court to determine whether the presumption in favor of severability is rebuttable and for other proceedings consistent with this opinion.

# I.

## A.

The barriers people with a criminal history face trying to find stable housing are well-documented. Approximately 90% of private landlords conduct criminal background checks on prospective tenants, and nearly half of private landlords in Seattle say they would reject an applicant with a criminal history. As a result, formerly incarcerated persons are nearly 10 times as likely as the general population to experience homelessness or housing insecurity,[1] and one in five people who leave prison become homeless shortly thereafter.

Seattle currently faces a housing crisis. Almost 12,000 people experience homelessness each night in the City, which has one of the most expensive rental markets in the United States. In 2022, the City's waiting lists for subsidized housing range from one to eight years. As *amici* recognize, "[c]riminal history screening exacerbates . . . affordability challenges by disqualifying persons from rental housing even when they have the financial means to afford the housing and could live there successfully." Br. of Amici Curiae Nat'l Housing L. Project, Shriver Ctr. on Poverty Law, Tenant L. Center, Formerly Incarcerated & Convicted People, and Families Movement & Just Cities Inst. (Shriver Am. Br.) 26.

This "prison to homelessness pipeline" has a host of negative effects on communities. Persons without stable

---

[1] *See* Lucius Couloute, *Nowhere to Go: Homelessness Among Formerly Incarcerated People*, Prison Policy Initiative, https://www.prisonpolicy.org/reports/housing.html (Aug. 2018) (last visited Aug. 29, 2022).

housing are significantly more likely to recidivate, with one study estimating that people with unstable housing were up to seven times more likely to re-offend.[2]  They are less likely to be able to find stable employment and access critical physical and mental healthcare.[3]  And, as *amici* explain, "the sheer number of children who have a parent with a criminal record necessarily means that the damaging impacts of a criminal record touch multiple generations."  Br. of Amici Curiae Pioneer Hum. Servs., Tenants Union of Wash., Fred T. Korematsu Ctr. for L. & Equality, and ACLU of Wash. (Pioneer Am. Br.) 8 (citation omitted).  Housing instability can make "family reunification post-incarceration 'difficult if not impossible,'" and often results in children being placed in foster care.  *Id.* (citation omitted).

These consequences are not borne equally by all Americans.  In the United States, people of color are significantly more likely to have a criminal history than their white counterparts.  Discriminatory law enforcement practices have resulted in people of color being "arrested, convicted and incarcerated at rates [that are] disproportionate to their share of the general population."[4]  In 2014, for example, African Americans comprised 12% of the total population, but 36% of the total prison population.[5]

---

[2] *See* Valerie Schneider, *The Prison to Homelessness Pipeline: Criminal Records Checks, Race, and Disparate Impact*, 93 Ind. L. J. 421, 432–33 (2018).

[3] *Id*. at 434.

[4] *Id*. at 423 (alteration in original) (quoting U.S. Dep't of Hous. & Urb. Dev., *Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions* 2 (2016)).

[5] *Id.* at 424 (citing U.S. Dep't of Hous. & Urb. Dev., *supra*, at 3).

As of 2018, one in nine Black men ages 20–34 was incarcerated, and one in three Black men had spent time in prison over the course of his lifetime.[6]

Seattle is no exception. Data from the Seattle Police Department show that "Black persons are stopped at a rate that is 4.1 times that of non-Hispanic white persons and Indigenous persons are stopped a rate that is 5.8 times that of non-Hispanic white persons." Pioneer Am. Br. 7. While the overall population in King County, home to Seattle, is just 6.8% Black, the population of the King County jail is 36.6% Black, according to a 2021 report released by the County Auditor's Office.[7] And while Native Americans are 1.1% of the King County population, they number 2.4% of the County's jail population.

The correlation between race and criminal history can result in both unintentional and intentional discrimination on the part of landlords who take account of criminal history. A landlord with a policy of not renting to tenants with a criminal history might not bear any racial animus, but the policy could nevertheless disproportionately exclude people of color. On the flip side, a landlord who does not wish to rent to non-white tenants could mask discriminatory intent with a "policy" of declining to rent to tenants with a criminal history. A 2014 fair housing test conducted by the Seattle

---

[6] *Id.* (citing Avlana K. Eisenberg, *Incarceration Incentives in the Decarceration Era*, 69 Vand. L. Rev. 71, 81 (2016)).

[7] *See* Lewis Kamb, *Audit of King County Jails Finds Racial Disparities in Discipline, Says 'Double-Bunking' Leads to Violence*, Seattle Times (Apr. 6, 2021) https://www.seattletimes.com/seattle-news/audit-of-king-county-jails-finds-racial-disparities-in-discipline-says-double-bunking-leads-to-violence/#:~:text=A%20disproportionate%20number%20of%20Black,been%20convicted%20of%20a%20crime (last visited Sept. 30, 2022).

Office of Civil Rights found evidence of the latter practice, reporting that testers belonging to minority groups were frequently asked about their criminal history, while similarly situated white testers were not. It also found incidents of differential treatment based on race in housing 64% of the time, including incidences of this practice.

The cumulative effects of racialized discrimination in housing on homelessness are hard to measure. However, it is striking that while Seattle is just 7% Black, Seattle's unhoused population is 25% Black.[8]

**B.**

After comprehensively studying this problem, in 2017, the City enacted the Fair Chance Housing Ordinance. The City stated two purposes for enacting the Ordinance: (1) "address[ing] barriers to housing faced by people with prior records;" and (2) lessening the use of criminal history as a proxy to discriminate against people of color who are disproportionately represented in the criminal justice system. Seattle, Wash., Ordinance 125393 at 5 (Aug. 23, 2017) (codified at S.M.C. §§ 14.09.010–.025). In enacting the Ordinance, the City found that "racial inequities in the criminal justice system are compounded by racial bias in the rental applicant selection process," and that "higher recidivism . . . is mitigated when individuals have access to safe and affordable housing." *Id*. at 2–3.

The Ordinance prohibits landlords from requiring disclosure or inquiring about "any arrest record, conviction

---

[8] *See How Seattle's Homelessness Crisis Stacks Up Across the Country and Region*, Seattle Times (June 27, 2021) https://projects.seattletimes.com/2021/project-homeless-data-page (last visited Sept. 30, 2022).

record, or criminal history" of current or prospective tenants, and from taking adverse action against them based on that information.**9** S.M.C. § 14.09.025(A). An "adverse action" includes, among other things, "[r]efusing to engage in or negotiate a rental real estate transaction," "denying tenancy," "[e]xpelling or evicting an occupant," and applying different rates or terms to a rental real estate transaction. *Id.* § 14.09.010.

The Ordinance's inquiry provision includes four exceptions relevant here. First, all landlords may inquire about a prospective tenant's sex offender status and take certain adverse actions based on that information. *Id*. §§ 14.09.025(A)(2), 14.09.115(B). Second, so as not to conflict with federal law, the adverse action requirement does not apply to "landlords of federally assisted housing subject to federal regulations that require denial of tenancy." *Id*. § 14.09.115(B). Third, the provision "shall not apply to the renting, subrenting, leasing, or subleasing of a single family dwelling unit in which the owner or subleasing tenant or subrenting tenant occupy part of the single family dwelling unit." *Id*. § 14.09.115(C). Fourth, neither provision applies to "the renting, subrenting, leasing or subleasing of an accessory dwelling unit or detached accessory dwelling unit [in which] the owner or person entitled to possession [of the dwelling] maintains a

---

[9] During the height of the COVID-19 pandemic, the City amended the Ordinance to also prohibit landlords from taking adverse actions against tenants based on evictions that occurred during the state of emergency. *See* S.M.C. § 14.09.026. As a result, the ordinance was renamed the "Fair Chance Housing and Evictions Records Ordinance." *Id.* § 14.09.005.

permanent residence, home or abode on the same lot."
*Id*. § 14.09.115(D).

Seattle is not the only jurisdiction to have adopted
legislation restricting reliance on criminal history
backgrounds by landlords. Other cities, including Berkeley,
Oakland and Ann Arbor, have adopted ordinances similar to
Seattle's.[10] However, the vast majority of jurisdictions have
adopted ordinances that permit landlords to consider at least
some of a potential tenant's criminal history, albeit with
some additional protections.[11]

## C.

Several months after Seattle passed the Ordinance, the
landlords and their trade organization (collectively,
"landlords") sued the City challenging its constitutionality.
Plaintiffs Chong and MariLyn Yim, Kelly Lyles, and Eileen,
LLC are local landlords who own and manage small rental
properties in Seattle. Plaintiff Rental Housing Association
of Washington (RHA) is a nonprofit trade organization for
landlord members, most of whom own and rent residential
properties in Seattle. RHA provides professional screening
services, including background checks, on potential tenants
to its some 5,300 members.

The landlords initially filed their suit in state court,
facially challenging two provisions of the statute. First, they

---

[10] *See* Berkeley, Cal., Mun. Code § 13.106.040, *et seq.*; Oakland, Cal.,
Mun. Code § 8.25.010, *et seq.*; Ann Arbor, Mich., Mun. Code, Title IX,
Chapter 122, § 9:600, *et seq*.

[11] *See* National Housing Law Project, *Fair Chance Ordinances: An
Advocate's Toolkit* 38–40 (2019), https://www.nhlp.org/nhlp-
publications/fair-chance-ordinances-an-advocates-toolkit (last visited
Sept. 30, 2022).

challenged the "inquiry provision," which bars landlords from asking about a tenant's criminal history, alleging that it violated their First Amendment rights as well as their corollary rights under the Washington State Constitution. The landlords contend that the inquiry provision should be deemed non-commercial speech subject to strict scrutiny, which it cannot survive, or alternatively, if deemed commercial speech subject to intermediate scrutiny, it fails as not narrowly tailored to the government's stated purposes.

Second, the landlords challenged the "adverse action provision," which bars landlords from taking adverse action against a tenant based on the tenant's criminal history, alleging that the provision violates their rights under the Substantive Due Process Clause, as well as their corollary rights under the Washington State Constitution. They argue that the statute infringed landlords' fundamental right to exclude persons from their property, and is thus subject to strict scrutiny, or alternatively, the provision cannot survive rational basis review because of an alleged disconnect between its ends and means.

Once the City removed the case to federal court, it proceeded rapidly. The parties stipulated that "discovery and trial [were] unnecessary," and filed cross-motions for summary judgment as well as a stipulated record. Before deciding the motions, the district court certified three questions to the Washington State Supreme Court regarding the standards of review accorded to the state constitution's substantive due process rights. The Washington State Supreme Court answered the certified questions, and, in a decision issued in January 2020, held that Washington State substantive due process claims are subject to the same standards as federal due process claims, and that the "same is true of state substantive due process claims involving land

use regulations and other laws regulating the use of property." *Yim v. City of Seattle*, 194 Wash.2d 682, 686 (2019). Therefore, the Washington court held that the standard of review for the landlords' substantive due process challenge to the Ordinance is rational basis review. *Id.*

On July 6, 2021, the district court granted summary judgment in favor of the City, upholding the Ordinance. On the First Amendment claims, the district court held as a threshold matter that the landlords had standing to challenge the application of the provision to inquiries about only prospective tenants, not current tenants. Moving to the merits, the district court held that the inquiry provision did implicate the First Amendment, but that it regulated commercial speech, which subjected it to intermediate scrutiny. Applying intermediate scrutiny, the district court upheld the Ordinance, reasoning that Seattle had asserted substantial interests, that the Ordinance directly advanced those interests, and that it was narrowly drawn to achieve them. On the substantive due process claim, the district court held that the landlords' asserted right "to rent their property to whom they choose, at a price they choose, subject to reasonable anti-discrimination measures" was not a fundamental right. It was therefore subject to rational basis review, which it readily survived. The landlords filed this timely appeal.

## II.

The grant of summary judgment is reviewed de novo. *Sandoval v. County of Sonoma*, 912 F.3d 509, 515 (9th Cir. 2018). "We determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Wallis*

*v. Princess Cruises, Inc.*, 306 F.3d 827, 832 (9th Cir. 2002) (citing *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001)).

## III.

On appeal, the landlords reassert their argument that the inquiry provision of the Ordinance violates the First Amendment,[12] as applied to prospective tenants.[13] They also argue that the adverse action provision impermissibly interferes with their fundamental property right to exclude prospective tenants based on their criminal history.

## A.

Before determining the constitutionality of the inquiry provision, we must determine the scope of the speech it regulates. The parties dispute the persons to whom the inquiry provision applies, that is, which individuals the provision prohibits from inquiring about prospective tenants' criminal history. *See United States v. Williams*, 553 U.S. 285, 293 (2008) ("[I]t is impossible to determine whether a statute reaches too far without first knowing what the statute covers."). The City contends that the provision bars landlords from inquiring into the criminal history of their own prospective tenants, while the landlords contend that it more broadly bars anyone in Seattle from inquiring into the criminal history of any person who happens to be

---

[12] Before the district court, "[t]he parties assume[d] that the free speech clause in Washington's constitution [was] coextensive with the First Amendment in this context and the Court assume[d] the same." This assumption is not contested on appeal.

[13] The district court held that the landlords had standing to challenge the application of the provision to inquiries about prospective tenants only. The landlords do not appeal this holding.

seeking to rent any apartment for any reason, whether to transact business or not.

The dispute stems from the way the City defines "person" in the Ordinance. The inquiry provision prohibits "any person" from asking about a prospective occupant's criminal history:

> It is an unfair practice for any *person* to . . . inquire about . . . any arrest record, conviction record, or criminal history of a prospective occupant except pursuant to certain exceptions.

S.M.C. § 14.09.025(A), (2) (emphasis added). Section 14.09.010 of the Ordinance defines "person" as one or more "individuals" or "organizations." The landlords argue that because the definition of "person" in the Ordinance is not limited to "the landlord or occupant of the unit the prospective tenant is seeking to rent," the Ordinance prevents anyone, not just the landlord or occupant in question, from inquiring about that person's criminal history. That is, so long as a person is actively seeking an apartment, and is thus a "prospective tenant," the provision bars anyone from looking into that person's criminal history, even people unrelated to the transaction, such as the City, a journalist, or a firearms dealer. The City, relying on statutory context, legislative history and common sense, argues that the definition of "person" is limited to the landlord or occupant of the unit the prospective tenant is seeking to rent.

We conclude that the City has the better of the argument. We are required to interpret terms "in the context of the Ordinance as a whole," and nothing about the Ordinance's

text, purpose, or legislative history indicates that the City intended it to regulate anything other than rental housing. *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1274 (9th Cir. 2017). For example, the title of the Ordinance is the "Fair Chance *Housing* Ordinance," *see* Seattle, Wash., Ordinance 125393 (emphasis added), and Chapter 14.09, where the Ordinance was eventually codified, is titled "Use of Screening Records in *Housing*." S.M.C. § 14.09 (emphasis added). "Fair chance housing" is then defined as "practices to reduce barriers to *housing* for persons with criminal records." *Id.* § 14.09.010 (emphasis added).

Other textual provisions support the conclusion that the City intended to limit the Ordinance to the landlord-tenant context. The text explicitly provides that every application for a rental property "shall state that *the landlord* is prohibited from requiring disclosure, asking about, rejecting an applicant, or taking an adverse action based on any arrest record, conviction record, or criminal history." *Id*. § 14.09.020 (emphasis added). Section 14.09.025, entitled "Prohibited use of criminal history," prohibits "any person" from "carry[ing] out an adverse action" based on sex offender registry information, "unless *the landlord* has a legitimate business reason for taking such action." *Id*. § 14.09.025 (emphasis added).

"[W]e are not required to interpret a statute in a formalistic manner when such an interpretation would produce a result contrary to the statute's purpose or lead to unreasonable results." *United States v. Combs*, 379 F.3d 564, 569 (9th Cir. 2004). The very purpose of the Ordinance was to reduce barriers to housing and housing discrimination by barring landlords from considering an applicant's criminal history. *See* S.M.C. § 14.09.010. Additionally, the landlords' broad interpretation of the Ordinance would

prohibit background checks on prospective tenants in all contexts, including for firearm sales or in the employment context, which are explicitly permitted in other areas of the Seattle Municipal Code. *Id.* §§ 12A.14.140 (permitting background checks for firearm sales), 14.17.020 (permitting employers to perform criminal background checks on job applicants). A housing ordinance that bars most legally permitted criminal background checks would lead to an "unreasonable or impracticable result[]." *United States v. Daas*, 198 F.3d 1167, 1174 (9th Cir. 1999).

Here, the text, context, and purpose of the statute undermine the landlords' view, and demonstrate that the inquiry provision bans *landlords* from inquiring into the criminal history of tenants applying to inspect, rent, or lease their properties.

## B.

The district court held that the Ordinance regulates speech, not conduct, and that the speech it regulates is commercial speech. The district court then applied an intermediate level of scrutiny to hold that the Ordinance was constitutional as a "reasonable means of achieving the City's objectives and does not burden substantially more speech than is necessary to achieve them." The parties on appeal dispute whether the Ordinance regulates commercial speech and calls for the application of intermediate scrutiny, or whether the Ordinance regulates non-commercial speech and is subject to strict scrutiny review. We need not decide that question, however, because we conclude that the Ordinance does not survive the intermediate scrutiny standard of review. Because "the outcome is the same whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied," *Sorrell v. IMS Health*

*Inc.*, 564 U.S. 552, 571 (2011), we do not decide whether the Ordinance regulates commercial or non-commercial speech. Assuming, without deciding, that the Ordinance regulates commercial speech, we apply the intermediate scrutiny standard codified in *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557 (1980).[14] Under *Central Hudson*, courts must analyze: (1) whether the "commercial speech" at issue "concern[s] lawful activity" and is not "misleading"; (2) "whether the asserted government interest is substantial" in regulating the speech; (3) "whether the regulation directly advances the governmental interest asserted"; and (4) "whether it is not more extensive than is necessary to serve that interest." *Id.* at 566.

"Any First Amendment interest . . . is altogether absent when the commercial activity itself is illegal, and the restriction on advertising is incidental to a valid limitation on economic activity." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rel.*, 413 U.S. 376, 389 (1973). It is undisputed that the Ordinance does not prohibit misleading speech.[15] Rather, it prohibits inquiring about information

---

[14] To the extent the landlords argue that even if the inquiry provision regulates commercial speech, the court should apply strict rather than intermediate scrutiny because it is "content based," this argument is refuted by our precedent, which holds that content-based restrictions of commercial speech are subject to intermediate scrutiny as well. *See Valle Del Sol, Inc. v. Whiting*, 709 F.3d 808, 820 (9th Cir. 2013) (applying intermediate scrutiny to "content-based restrictions" of commercial speech).

[15] The City does not concede that the statute does not regulate speech that "concerns unlawful activity or is misleading." However, its argument is circular: "Because the adverse-action provision bans landlords from using criminal history in selecting tenants, the inquiry

that is of record, and most likely accurate. While criminal records may be "associated with unlawful activity," reviewing and obtaining criminal records is generally a legal activity. A prohibition on reviewing criminal records therefore is not speech that "proposes an illegal transaction" and does not escape First Amendment scrutiny under *Central Hudson*. *Valle Del Sol*, *Inc.*, 709 F.3d at 821.

The City's stated interests—reducing barriers to housing faced by persons with criminal records and the use of criminal history as a proxy to discriminate on the basis of race—are substantial. The landlords do not challenge the importance of these interests. Therefore, we evaluate whether the Ordinance directly and materially advances the government's substantial interests, and whether it is narrowly tailored to achieve them.

**i.**

To be sustained, the Ordinance must directly advance a substantial state interest, and "the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose." *Central Hudson*, 447 U.S. at 564. A restriction "directly and materially advances" the government's interests if the government can show "the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 626 (1995) (citations omitted). There is no dispute that the harms the City points to—a crisis of homelessness among the formerly incarcerated and landlords' use of criminal history as a proxy for race—"are real," or that the City's purpose was to combat racial

provision's prohibition on asking for criminal history regulates speech related to unlawful activity."

discrimination.  The only question is whether the part of the policy the City enacted to address them, the inquiry provision, does so in a meaningful way.

We have observed that a statute cannot meaningfully advance the government's stated interests if it contains exceptions that "undermine and counteract" those goals. *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 489 (1995). "One consideration in the direct advancement inquiry is underinclusivity . . . *Central Hudson* requires a logical connection between the interest a law limiting commercial speech advances and the exceptions a law makes to its own application." *Valle Del Sol Inc.*, 709 F.3d at 824 (internal quotation marks and citation omitted).  For example, in *Rubin*, the Supreme Court considered a federal regulation which banned brewers from advertising the strength of their beer using numbers, but allowed them to do so using "descriptive terms" with the goal of preventing brewers from competing in "strength wars" over alcohol content.  *Rubin*, 514 U.S. at 489.  The Court struck down the regulation, holding that the rule did not do anything meaningful to prevent brewers from competing on alcohol content because the exception—allowing brewers to communicate the exact same information about alcohol content, just in words instead of numbers—completely swallowed the rule.  *Id*.

The landlords contend that the inquiry provision does not "materially advance" the City's interests because "[t]he Ordinance's exception for federally assisted housing renders it fatally underinclusive."  That is, even assuming a policy barring all landlords from inquiring about a person's criminal history would directly advance the City's goals, an otherwise identical policy including the federal exemption would not.  In support of that argument, they observe that

many persons with a criminal record have federal housing vouchers.

However, as written, the Ordinance excludes only the adverse action provision from applying to federally assisted housing. S.M.C. § 14.09.115(B) (providing that "Chapter 14.09 shall not apply to an *adverse action* taken by landlords of federally assisted housing subject to federal regulations that require denial of tenancy") (emphasis added). The only provision that would appear to exempt federal housing from the inquiry provision is the first exemption, which generally provides that the Ordinance "shall not be interpreted or applied to diminish or conflict with any requirements of state or federal law." *Id.* § 14.09.115(A).

"It is well established that a law need not deal perfectly and fully with an identified problem" in order to directly and materially advance the government's interests. *Contest Promotions, LLC v. City & Cnty. of San Francisco*, 874 F.3d 597, 604 (9th Cir. 2017); *see also Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 435 (2015) (warning that the "[t]he State should not be punished for leaving open more, rather than fewer, avenues of expression, especially when there is no indication of a pretextual motive for the selective restriction of speech"). In this case, however, the adverse action exemption is well-justified by the City's interest in preventing federal law from preempting the Ordinance. Federally assisted housing providers are required under federal regulations to deny tenancy for tenants who have certain convictions. *See*, *e.g.*, 24 C.F.R. §982.553(a)(1)(ii)(C) (denying admission if a "household member has ever been convicted of drug-related criminal activity for manufacture or production of methamphetamine on the premises of federally assisted housing."). If the City had enacted an

ordinance potentially preempted by federal regulation, the City would have risked having to later revise its own laws.

While the Ordinance might better achieve its goals if it applied to more types of landlords, there is no evidence that exempting federal landlords from the adverse action provision undermines the effectiveness of subjecting private landlords to the inquiry provision. In fact, the exemption may strengthen the Ordinance by avoiding conflict with federal law.

## ii.

However, we must disagree with the district court that the Ordinance is "narrowly drawn" to achieve the City's stated goals. *Central Hudson*, 447 U.S. at 565 (internal quotation marks and citation omitted).

"[I]f the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive." *Id.* at 564. Courts therefore must consider "[t]he availability of narrower alternatives," which accomplish the same goals, but "intrude less on First Amendment rights." *Ballen v. City of Redmond*, 466 F.3d 736, 743 (9th Cir. 2006).[16] "In requiring that [the

---

[16] The landlords propose a number of alternative policies, none of which is a reasonable substitute for the Ordinance. First, they argue that the City could have omitted the inquiry provision entirely, and simply passed the adverse action provision. However, if landlords are allowed to access criminal history, just not act on it, it makes the Ordinance extremely difficult to enforce, and makes it more likely that unconscious bias will impact the leasing process. *See* Helen Norton, *Discrimination, the Speech That Enables It, and the First Amendment*, 2020 U. Chi. L. For. 209, 218 (2020) ("Legislatures' interest in stopping discrimination before the fact is especially strong because after-the-fact enforcement is frequently slow, costly, and ineffective."). Second, the landlords argue

restriction] be 'narrowly tailored' to serve an important or substantial state interest, we have not insisted that there be no conceivable alternative, but only that the regulation not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Board of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 478 (1989) (cleaned up) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)). In considering the "fit between the legislature's ends and the means chosen to accomplish those ends," the fit must not necessarily be the "least restrictive means," but "reasonable" and through "a means narrowly tailored to achieve the desired objective." *Id.* at 480 (cleaned up).

In order to conclude that the inquiry provision was "narrowly drawn" to achieve the City's goals related to housing access and racial discrimination, we therefore must find that the City "carefully calculated the costs and benefits

---

that the City should address its "own biased policing practices," which it pegs as a source of the racial disparities in criminal history. However, as the Third Circuit has observed, "[i]ntermediate scrutiny . . . does not require that the City adopt such regulatory measures only as a last alternative." *Greater Philadelphia Chamber of Commerce v. City of Philadelphia*, 949 F.3d 116, 156 (3d Cir. 2020). Third, the landlords suggest that the City could have adopted a "certification program," where persons with a criminal history could provide landlords with an official certificate that demonstrates a consistent pattern of law-abiding behavior. However, as the City observes in its brief, that alternative was considered during the Ordinance's passage, and rejected because its sweep would be too narrow. Finally, the landlords suggest that Seattle build more public housing. However, in order to survive intermediate scrutiny, the content of a challenged regulation must reflect that a City weighed the "costs and benefits" of a particular regulation, and the costs of building new housing are astronomical. *Discovery Network,* 507 U.S. at 417.

associated with the burden on speech," *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 (1993) (internal quotation marks omitted), and that the inquiry provision struck a "reasonable" balance between the interests of various parties. *Fox*, 492 U.S. at 480. Here, the inquiry provision—a complete ban on any discussion of criminal history between the landlords and prospective tenants—is not "in proportion to the interest served" by the Ordinance in reducing racial injustice and reducing barriers to housing. *Id.* (citation omitted). Other cities have enacted similar ordinances to achieve the same goals of reducing barriers to housing and racial discrimination as Seattle. While we do not address the constitutionality of any of these ordinances, none of them forecloses all inquiry into criminal history by landlords, as does Seattle's blanket ban on any criminal history inquiry.[17]

The ordinances adopted by those other jurisdictions fall into two main categories. The first type of ordinance ("Type I")—adopted by Cook County,[18] San Francisco,[19]

---

[17] Respectfully, Judge Gould's dissent confuses the Ordinance's ends with its means. Seattle's "substantial interest[]" was not in "reducing discrimination against anyone with a criminal record." The Ordinance's stated goal was to "address barriers to housing faced by people with prior records" and reduce racial discrimination against people of color who are disproportionately represented in the criminal justice system. Those goals can be accomplished by means other than the Ordinance's: a near-blanket prohibition on any inquiry about a tenant's criminal history. A blanket ban on speech goes "*much further* than is necessary to serve the interest asserted." *Matal v. Tam*, 137 S. Ct. 1744, 1765 (2017) (emphasis added). None of the referenced ordinances bans all inquiry into criminal history.

[18] Cook County, Ill., Code § 42-38.

[19] S.F., Cal., Admin. Code §§ 87.1–.11.

Washington, D.C.,[20] Detroit,[21] and the State of New Jersey[22]—requires landlords to conduct an initial screening of potential tenants without looking at their criminal history and to notify applicants whether they pass that initial screening. At that point, landlords are permitted to order a criminal background check, but must provide the applicant with a copy of the report, give them a chance to provide mitigating information, and may consider only a limited subset of offenses. Cook County permits landlords to consider any convictions within the last three years; San Francisco and Washington, D.C. permit landlords to consider any convictions sustained within the past seven years; and the State of New Jersey creates a sliding scale, allowing landlords to consider fourth degree offenses within the past year, second or third degree offenses within the last four years, first degree offenses within the last six years, and a short list of extremely serious offenses including murder and aggravated sexual assault no matter when they occurred.

The second type of ordinance ("Type II")—adopted by Portland[23] and Minneapolis[24]—allows landlords to *either* consider an applicant's entire criminal history, but complete a written individualized evaluation of the applicant, and explain any rejection in writing, *or* consider only a limited subset of offenses—misdemeanor convictions within the last

---

[20] D.C. Code §§ 42-3541.01–.09.

[21] Detroit, Mich., City Code § 26-5-1.

[22] N.J. Admin. Code §§ 13:5-1.1–2.7.

[23] Portland, Or., City Code § 30.01.086.

[24] Minneapolis, Minn., City Code § 244.2030.

three years or felony convictions within the last seven years—without any additional procedures.

The inquiry requirement in both types of ordinances imposes a significantly lower burden on landlords' speech. As *amici* assert, screening before the Ordinance often examined "the presence of violent offenses in a criminal history" and the "type of crime and length of time since the crime was committed." Br. of Amici Curiae Consumer Data Indus. Ass'n & the Pro. Background Screening Ass'n at 8; GRE Downtowner Am. Br. at 5. These ordinances would permit the landlords to ask a potential tenant about their most recent, serious offenses, which is the information a landlord would be most interested in. Neither ordinance imposes any additional costs on the City.

Indeed, the record demonstrates that Seattle considered a narrower version of the Ordinance, as well as many fair housing ordinances from other jurisdictions, and rejected those versions with little stated justification. The first version of the Seattle Ordinance permitted landlords to inquire about *some* criminal convictions, while still banning them from asking about: "arrests not leading to convictions; pending criminal charges; convictions that have been expunged, sealed, or vacated; juvenile records, including listing of a juvenile on a sex offense registry; and convictions older than two years from the date of the tenant's application." Yet, when it decided to broaden the inquiry provision to a blanket ban, the Council offered the tenuous explanation that landlords did not insist on background checks a decade ago, so therefore there was "no evidence that criminal history is an indicator of a bad tenant." A decade ago, however, the technology did not exist to readily screen potential tenants—much as routine credit checks on tenants did not exist a few decades ago. Like with credit

checks, as soon as the technology existed, landlords insisted on using it to screen tenants because they were concerned about tenants with a criminal history. From the record before us, Seattle offered no reasonable explanation why the more "narrowly tailored" versions of the bill could not "achieve the desired objective" of reducing racial barriers in housing. *Fox*, 492 U.S. at 480.

Because a number of other jurisdictions have adopted legislation that would appear to meet Seattle's housing goals, but is significantly less burdensome on speech, we conclude that the inquiry provision at issue here is not narrowly tailored, and thus fails intermediate scrutiny.[25]

## IV.

Next, the landlords challenge the "adverse action provision" of the Ordinance on the grounds that it violates their Fourteenth Amendment Substantive Due Process right to exclude persons from their property.[26]

The landlords argue that we should apply strict scrutiny to the Ordinance because the right to exclude is "fundamental." However, the Supreme Court has never recognized the right to exclude as a "fundamental" right in the context of the Due Process Clause. *Cf. Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021) (referring to the right to exclude as "a fundamental element of the property right" in the context of a takings clause analysis

---

[25] The constitutionality of the other ordinances is not an issue before us, and we do not opine on that question.

[26] The Washington Supreme Court has held that the "state substantive due process claims are subject to the same standards as federal substantive due process claims." *Yim v. City of Seattle*, 451 P.3d 694, 696 (Wash. 2019). So, the analysis of both claims is identical.

(citation omitted)); *see also Murr v. Wisconsin*, 137 S. Ct. 1933, 1943 (2017) (same); *Knick v. Twp. of Scott, Pa.*, 139 S. Ct. 2162, 2174 (2019) (same); *Kaiser Aetna v. United States*, 444 U.S. 164, 179–80 (1979) (same). And we have clearly held that "[t]he right to use property as one wishes is also not a fundamental right." *Slidewater LLC v. Wash. State Dept. of Lab. & Indus.*, 4 F.4th 747, 758 (9th Cir. 2021).

Under our precedent, when a law infringes on a non-fundamental property right, we apply rational basis review. *See Kawaoka v. City of Arroyo Grande*, 17 F.3d 1227, 1234 (9th Cir. 1994) ("In a substantive due process challenge, we do not require that the City's legislative acts actually advance its stated purposes, but instead look to whether the governmental body could have had no legitimate reason for its decision." (internal quotation marks, citations, and emphasis omitted)). The landlords argue that we should apply a slightly heightened form of scrutiny, relying on *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005), a case about the Takings Clause in which the Supreme Court held that the "[substantially advances] formula prescribes an inquiry in the nature of a due process, not a takings, test, and that has no proper place in our takings jurisprudence." *Id.* at 540. While *Lingle* rejected a form of heightened scrutiny in Takings Clause challenges, it did not address or change the standard for substantive due process challenges, and we have continued to apply rational basis scrutiny to substantive due process challenges that concern non-fundamental property rights. *See Samson v. City of Bainbridge Island*, 683 F.3d 1051, 1058 (9th Cir. 2012) (holding that where an ordinance did not impinge on a fundamental right, "to establish a substantive due process violation, the [Plaintiffs needed to] show that Bainbridge's ordinances . . . were 'clearly arbitrary

and unreasonable, having no substantial relation to the public health, safety, morals or general welfare.'" (quoting *Kawaoka*, 17 F.3d at 1234)); *Shanks v. Dressel*, 540 F.3d 1082, 1088–89 (9th Cir. 2008) (rejecting a substantive due process claim because appellants failed to show the government action was "constitutionally arbitrary").

To survive rational basis review, the government must offer a "legitimate reason" for passing the ordinance. *Kawaoka*, 17 F.3d at 1234 (citations omitted). Here, Seattle offers two legitimate rationales for its policy: reducing barriers to housing faced by persons with criminal records and lessening the use of criminal history as a proxy to discriminate on the basis of race. The landlords fail to seriously challenge the obvious conclusion that the adverse action provision is legitimately connected to accomplishing those goals. Therefore, we find the adverse action provision easily survives rational basis review.

## V.

We note that the Ordinance contains a severability clause, S.M.C. § 14.09.120, which states that:

> The provisions of this Chapter 14.09 are declared to be separate and severable. If any clause, sentence, paragraph, subdivision, section, subsection, or portion of this Chapter 14.09, or the application thereof to any landlord, prospective occupant, tenant, person, or circumstance, is held to be invalid, it shall not affect the validity of the remainder of this Chapter 14.09, or the validity of its application to other persons or circumstances.

Absent any legislative intent to the contrary, a severability clause ordinarily "creates a presumption that if one section is found unconstitutional, the rest of the statute remains valid." *United States v. Spokane Tribe of Indians*, 139 F.3d 1297, 1299 (9th Cir. 1998). The parties should have an opportunity to brief and argue before the district court whether there is evidence in the record that overcomes the presumption of severability. *See, e.g.*, *Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845, 860–61 (9th Cir. 2017) (affirming a district court ruling that a legislative provision was unconstitutional but severable). We therefore remand this case to the district court.

## VI.

For all the reasons stated above we **REVERSE** the district court in part, **AFFIRM** the district court in part, and remand to the district court for further proceedings consistent with this opinion.

---

WARDLAW, Circuit Judge, concurring:

While the majority opinion assumes, but does not decide, that the Ordinance regulates commercial speech, I would agree with the district court that the speech it regulates is commercial speech.

Commercial speech is "usually defined as speech that does no more than propose a commercial transaction." *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001) (citation omitted). However, that definition is "just a starting point," and courts "try to give effect to a common-sense distinction between commercial speech and other

varieties of speech." *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115 (9th Cir. 2021) (internal quotation marks and citations omitted). Indeed, "[o]ur commercial speech analysis is fact-driven, due to the inherent difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category." *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1272 (9th Cir. 2017) (internal quotation marks and citations omitted).

To distinguish between commercial and non-commercial speech, we apply the three-factor test derived from the Supreme Court's decision in *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60 (1983). We must determine whether: (1) "the speech is an advertisement," (2) "the speech refers to a particular product," and (3) "the speaker has an economic motivation." *Hunt v. City of L.A.*, 638 F.3d 703, 715 (9th Cir. 2011) (citing *Bolger*, 463 U.S. at 66–67). Each of these factors, standing alone, is insufficient to determine that speech is commercial in nature, but when all three are present, a conclusion that the speech at issue is commercial is strongly supported. *Bolger*, 463 U.S. at 67; *see also Dex Media West, Inc. v. City of Seattle*, 696 F.3d 952, 958 (9th Cir. 2012). When we consider these factors, we look not only to the speech itself, but examine the entire context in which it appears. *See, e.g.*, *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 481 (1995) (assuming that "the information on beer labels constitutes commercial speech").

The district court correctly concluded that the very core of the Ordinance here—a prohibition on requiring disclosure or making inquiries about criminal history generally on rental applications—falls squarely within the realm of commercial speech. Although not advertising per se, a rental application at its core "does no more than propose a commercial transaction." *United Foods*, 533 U.S. at 409;

*see also Ariix,* 985 F.3d at 1116 ("A publication that is not in a traditional advertising format but that still refers to a specific product can either be commercial speech — or fully protected speech."). A rental application allowing prospective tenants to inspect a property and make inquiries about their criminal history relates to a "specific product:" rental housing. *Bolger*, 463 U.S. at 66.

As to *Bolger*'s third factor, "regardless of whether [the parties] have an economic motivation . . . their regulated speech can still be classified as commercial" under *Bolger*. *First Resort*, 860 F.3d at 1273. However, in weighing this factor, courts assess "whether the speaker acted *primarily* out of economic motivation, not simply whether the speaker had *any* economic motivation." *Ariix*, 985 F.3d at 1116. Here, the landlords' inquiries about prospective tenants' criminal history are primarily economically motivated.

Courts have generally found that speech associated with deciding whether to engage in a particular commercial transaction—such as extending a lease, obtaining credit reports, or securing real estate—is motivated primarily by economic concerns. For example, in *San Francisco Apartment Ass'n v. City & Cnty. of San Francisco*, we held that all of the speech between a landlord and a tenant about entering into a buyout agreement was motivated primarily by economic concerns because "it relates solely to the economic interests of the parties and does no more than propose a commercial transaction." 881 F.3d 1169, 1176 (9th Cir. 2018); *accord Campbell v. Robb*, 162 F. App'x 460, 469 (6th Cir. 2006) (holding that statements "made by a landlord to a prospective tenant describing the conditions of rental" are "part and parcel of a rental transaction," and thus motivated primarily by economic concerns). Similarly, in *Anderson v. Treadwell*, the Second Circuit determined that

New York regulations limiting in-person solicitations by real estate brokers concerned commercial speech with a primary economic motivation, even if the communications in question included general "information regarding market conditions, financing and refinancing alternatives, and purchase/sale opportunities." 294 F.3d 453, 460 (2d Cir. 2002).

Courts have also generally found that consumer credit reports, compiled for the purpose of targeted marketing or calculating interest rates, constitute commercial speech. In *Trans Union Corp. v. F.T.C.*, for example, the D.C. Circuit held that restrictions on the sale of targeted marketing lists based on consumer credit reports should be subject to intermediate scrutiny because the reports were "solely of interest to the company and its business customers." 245 F.3d 809, 818 (D.C. Cir. 2001); *see also Millstone v. O'Hanlon Reports, Inc.*, 528 F.2d 829, 833 (8th Cir. 1976) ("[C]onsumer credit reports . . . are 'commercial speech.'"); *U.D. Registry, Inc. v. State of Cal.*, 50 Cal. Rptr. 3d 647, 660 (Cal. Ct. App. 2006) (assuming that "credit reports are commercial speech" and collecting cases that show "other courts have treated credit reports as commercial speech.").

Moreover, courts have found that speech related to hiring constitutes commercial speech. In *Greater Philadelphia Chamber of Commerce v. City of Philadelphia*, for example, the Third Circuit found that a potential employer's questions about a job applicant's salary history were motivated primarily by economic concerns "[b]ecause the speech occur[ed] in the context of employment negotiations," and was thus "part of a proposal of possible employment." 949 F.3d 116, 137 (3d Cir. 2020) (internal quotation marks omitted); *see also Valle del Sol, Inc. v. Whiting*, 709 F.3d 808, 818 (9th Cir. 2013) (holding that provisions regulating

the "hiring, picking up and transporting [of] workers" impacted speech "soliciting a commercial transaction or speech necessary to the consummation of a commercial transaction"); *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rel.*, 413 U.S. 376, 387 (1973) (concluding that employers placing employment advertisements in sex-designated newspaper columns was in "the category of commercial speech").

Here, landlords' inquiries about a prospective tenant, including their criminal history, are aimed at answering one question: whether the applicant is one with whom the landlords should enter into a commercial transaction that will financially benefit them. Like the landlord in *San Francisco Apartment Association*, a business seeking a credit report in *Trans Union*, and the employer in *Greater Philadelphia*, landlords ultimately use an applicant's criminal history to "propose a commercial transaction" and further their own economic interests. *San Francisco Apartment Ass'n*, 881 F.3d at 1176.

The landlords disagree, arguing that while landlords might be primarily motivated by economic concerns when they ask some questions on a rental application (for example, questions about income, credit score or rental history), when they ask about criminal history, they are primarily motivated by concerns about their own safety and the safety of their other tenants. For example, the Yims assert that they include a question about potential tenants' criminal history because they live in one of the units of the triplex they rent out, and they want to make sure their children are safe. Similarly, Lyles asserts that she asks potential tenants about their criminal history because she frequently interacts with tenants in person, including to collect rent or fix problems in the unit, and wants to ensure her safety. These

noncommercial interests, the landlords argue, are "inextricably intertwined" with commercial interests. *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988).

However, while some landlords may have safety in mind, as well as questions about financial risk and reliability, all of the information they glean about applicants is used to decide whether to enter into a *commercial* transaction with them.  There is no question that "the creation and dissemination of information" is protected speech and requiring disclosure of information is as well. *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 570 (2011).  However, it is also true that the particular information sought here—criminal history—is input primarily for economic reasons.  Indeed, the Ordinance explicitly allows owners living "on the same lot" or property as their tenants to inquire about and take adverse action against prospective tenants based on criminal history, presumably to allow landlords to address personal, rather than economic, concerns.  S.M.C. § 14.09.115(D).  And even landlord *amicus* stresses its economic interests in obtaining prospective tenant's criminal history, including the "[c]osts associated with a single eviction," occupancy declines in rentals due to safety concerns, and security costs. Br. of Amicus Curiae GRE Downtowner, LLC at 7 ("GRE Downtowner Am. Br.").  The City has simply chosen to remove the criminal history inquiry from the ultimate commercial decision.

The landlords cannot identify one aspect of the transaction between them and prospective tenants that is noncommercial in nature.  They therefore point to the professional screening services provided by plaintiff RHA to argue that speech between the landlords and RHA is not commercial because RHA is not a party to the rental

transaction. But, like the credit reports discussed in *Trans Union*, RHA sells its screening services to landlords—at various prices depending on the extent of the background search—which RHA obtains through a third party. Thus, the landlords are engaging in a separate commercial transaction with an economic motive when they request the type of screening package and purchase it for a particular prospective applicant. The speech attendant to that particular transaction—purchasing a criminal screening—is speech "that does no more than propose a commercial transaction." *United Foods*, 533 U.S. at 409. It is therefore "quintessential commercial speech," as the district court held.

*Sorrell* does not compel a contrary conclusion. As an en banc panel of our court has held, nothing in *Sorrell* changes the applicability of the *Bolger* test or the relevance of *Central Hudson*. *Retail Digital Network, LLC v. Prieto*, 861 F.3d 839, 841, 847–48 (9th Cir. 2017) (en banc) (holding that "*Sorell* did not modify the *Central Hudson* standard" and that "content- and speaker-based" regulations of commercial speech are subject to the same test as any other kind of commercial speech). In *Sorrell*, the Supreme Court considered a First Amendment challenge to a Vermont statute which prohibited pharmaceutical manufacturers and marketers from obtaining data from third parties about doctors' prescription practices for the purpose of marketing the pharmaceutical companies' products. 564 U.S. at 563–64. The Court first held that the Vermont statute was a "content- and speaker-based restriction," and that "[t]he First Amendment requires heightened scrutiny whenever the government creates a regulation of speech because of disagreement with the message it conveys." *Id.* at 566, 571 (cleaned up). The Court then assumed without deciding that

the statute regulates commercial speech, applied the *Central Hudson* test, and decided that the Vermont statute did not survive intermediate scrutiny. *Id.* at 571. Far from creating a per se rule that "a law that imposes content-and-speaker-based restrictions" is noncommercial speech subject to strict scrutiny, the *Sorrell* court applied intermediate scrutiny to the law at issue, as the majority opinion does here.

Therefore, the Ordinance regulates commercial speech and is subject to an intermediate standard of review, which it fails to survive.

---

BENNETT, Circuit Judge, concurring in part and concurring in the result:

I concur in the majority opinion, except for Part III.B.i and footnote 16, and I concur in the result. I write separately, however, because I would find that strict scrutiny applies because the Ordinance, on its face, is a content- and speaker-based restriction of *noncommercial* speech. And the Ordinance clearly fails strict scrutiny.

## I.   Strict Scrutiny Applies

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011), compels the conclusion that strict scrutiny applies. In *Sorrell*, a Vermont law "prohibit[ed] pharmacies . . . from disclosing or otherwise allowing prescriber-identifying information to be used for marketing" and barred "pharmaceutical manufacturers and detailers from using the information for marketing." *Id*. at 563. The law allowed "pharmacies [to] sell the information to private or academic researchers, but not . . . to pharmaceutical marketers." *Id*. (citation omitted).

The Supreme Court held the law unconstitutional. *Id.* at 557. The Court found that the law enacted "content-[ ]and speaker-based restrictions," *id.* at 563, because it forbade "sale subject to exceptions based . . . on the content of a purchaser's speech. For example, those who wish[ed] to engage in certain 'educational communications' [could] purchase the information. The measure then bar[red] any disclosure when recipient[s] . . . [would] use the information for marketing," *id*. at 564 (citation omitted). "The statute thus disfavor[ed] marketing, that is, speech with a particular content." *Id*. The law also "disfavor[ed] specific speakers" such as pharmaceutical manufacturers, as they could not "obtain prescriber-identifying information, even though the information [could] be purchased or acquired by other speakers with diverse purposes and viewpoints." *Id*. Thus, the Court held that "[t]he law on its face burdens disfavored speech by disfavored speakers." *Id*.

In holding the law unconstitutional, the Court rejected Vermont's argument that "heightened judicial scrutiny [was] unwarranted because its law [was] a mere commercial regulation." *Id.* at 566. While recognizing that "the First Amendment does not prevent restrictions . . . imposing incidental burdens on speech," the Court rejected Vermont's contention because Vermont's law imposed "more than an incidental burden on protected expression." *Id.* at 567. Thus, under *Sorrell*, a law that imposes content-and speaker-based restrictions on noncommercial speech is subject to strict scrutiny.

This case mirrors *Sorrell*. Just like the Vermont law, which barred disclosure of prescriber-identifying information to marketers but permitted disclosure to researchers for educational communications, *see id.* at 563–64, the Ordinance bars a group's access to information that

is available to another group (landlords' access to criminal history, which is available to the public) and bans a group's use of such information for a certain purpose (landlords evaluating prospective tenants).    Indeed, this criminal history information is available to everyone *except* a landlord seeking information about a prospective tenant.[1] Thus, as in *Sorrell*, the Ordinance is a content- and speaker-based regulation.

And just like the Vermont law, the Ordinance does not regulate commercial speech.  When commercial speech is "inextricably intertwined" with noncommercial speech it "sheds its commercial character and becomes fully protected speech." *Dex Media W., Inc. v. City of Seattle*, 696 F.3d 952, 958 (9th Cir. 2012) (quoting *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 796 (1988)).  There are plainly a substantial number of real-life instances when the Ordinance regulates noncommercial speech.  For example, it would regulate when landlords ask third parties without economic interests about prospective tenants.  This would include querying publicly available information, or even doing a Google search for a prospective tenant's prior convictions.  *See Sorrell*, 564 U.S. at 569 (quoting with approval *Los Angeles Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32, 42 (1999) (Scalia, J., concurring) ("[A] restriction upon access that *allows* access to the press . . . , but at the same time *denies* access to persons who wish to use the information for certain speech purposes, is in reality a restriction upon speech." (alterations in original))).  That landlords have some commercial interests does not

---

[1] The City does not (and cannot) deny plaintiffs' contention that "[a]ll 50 states provide publicly available criminal background information for a wide range of purposes."

transform every one of their inquiries about a prospective tenant's prior behaviors, including prior convictions for violent crimes, into commercial speech. *See id.* at 566–67 (holding that a restriction on "speech result[ing] from an economic motive" is not "a mere commercial regulation"). A landlord who prioritizes the safety of other tenants through inquiries about, for example, whether a prospective tenant has ever been convicted of assaulting a fellow tenant, or selling heroin to a fellow tenant's child, is not engaging in commercial speech simply because the landlord charges rent to tenants.[2] Because the Ordinance regulates noncommercial speech, any commercial speech "sheds its commercial character and becomes fully protected speech." *Dex Media*, 696 F.3d at 958.

In short, *Sorrell* controls, and our analysis should end there. Indeed, because the Ordinance does not regulate commercial speech, there is no need to apply the *Bolger*[3] factors to the Ordinance at all. *See IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1122 (9th Cir. 2020) (acknowledging that the *Bolger* factors are relevant only if there is a "close" question as to whether the speech at issue is commercial). The Ordinance is a content- and speaker-

---

[2] "[T]here is no need to determine whether *all* speech hampered by [the Ordinance] is commercial," *Sorrell*, 564 U.S. at 571 (emphasis added), because "the entirety [of the regulated speech] must be classified as noncommercial" if "pure speech and commercial speech" are "inextricably intertwined," *id.* (cleaned up). Thus, even if some inquiries about the criminal records of prospective tenants could, as a theoretical matter, be classified as commercial speech, such hypothetical commercial speech is inextricably intertwined with an almost limitless number of inquiries about the criminal records of prospective tenants that are not remotely commercial in nature.

[3] *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983).

based restriction of noncommercial speech and so strict scrutiny applies.

## II. The Ordinance Necessarily Fails Strict Scrutiny

As the majority opinion holds, assuming without deciding that intermediate scrutiny applies, the Ordinance fails intermediate scrutiny. Maj. Op. at 18–20, 23–28. The Ordinance then necessarily fails strict scrutiny, which I believe is applicable. To reinforce that the Ordinance would not survive strict scrutiny, I highlight other reasons why it fails intermediate scrutiny.

### A. The Ordinance does not directly advance the City's asserted interest because the Ordinance contradicts that interest and is unconstitutionally underinclusive.

Under *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 566 (1980), "we must determine whether the regulation directly advances the governmental interest asserted." In doing so, "we must look at whether the [challenged speech regulation] advances [the asserted state] interest in its general application," not limited to the plaintiffs. *Metro Lights, L.L.C. v. City of Los Angeles*, 551 F.3d 898, 904 (9th Cir. 2009). "Another consideration in the direct advancement inquiry is 'underinclusivity[.]' . . . [Under *Central Hudson*,] a regulation . . . [with] exceptions that 'undermine and counteract' the interest the government claims it adopted the law to further . . . cannot 'directly and materially advance its aim.'" *Id*. at 904–05 (quoting *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 489 (1995)). Thus, "*Central Hudson* requires a logical connection between the interest a law limiting commercial speech advances and the exceptions a law makes to its own application." *Id*. at 905.

The City argues that people with criminal histories "tend to struggle with housing," and criminal records "are disproportionately held by minorities." The City argues that the Ordinance directly advances its interest in "reduc[ing] landlords' ability to . . . deny[] tenancy based on criminal history" by "reducing landlords' ability to obtain applicants' criminal histories." In order to advance such an interest, this protection must logically be extended to anyone with a criminal history, regardless of the offense or disposition involved. Consistent with this asserted position, the Ordinance bars "any person" from "[r]equir[ing] disclosure [of,] inquir[ing] about, or tak[ing] an adverse action against a prospective occupant . . . based on . . . criminal history." Seattle, Wash., Municipal Code (S.M.C.) § 14.09.025(A)(2).

But the Ordinance permits all landlords to both inquire about and take adverse action based on a prospective occupant's sexual offenses, which contradicts the City's stated interest in reducing housing discrimination against those who have "already paid their debt to society." While the Ordinance prohibits anyone from requiring disclosure of, inquiring about, or taking an adverse action against a prospective occupant based on "criminal history," the Ordinance's definition of criminal history "does not include status registry information." S.M.C. § 14.09.010. "Registry information" is defined as "information solely obtained from a county, statewide, or national sex offender registry." *Id*. Thus, the Ordinance allows any landlord to inquire about whether a prospective occupant is a registered sex offender. The Ordinance also permits "an adverse action based on registry information of a prospective adult occupant" if a landlord shows "a legitimate business reason" for the adverse action. S.M.C. § 14.09.025(A)(3).

The Ordinance fails the direct advancement test due to inconsistency, because it lacks "a logical connection between the interest a law limiting commercial speech advances and the exceptions a law makes to its own application." *Metro Lights*, 551 F.3d at 905. The City asserts an interest in preventing "[c]riminal records [from] being used . . . to reconvict . . . [those] who have already paid their debt to society." But the City fails to show why legal protection based on such an interest should extend to some people with criminal histories (for example, someone convicted of murdering his previous landlords) but not to others (sex offenders).

Indeed, the City's own defense of its exclusion highlights the inconsistency between its asserted interest and the exclusion. According to the City, plaintiffs "overlook" the fact that it "took a balanced approach . . . by requiring a landlord to show that rejecting a person on the sex offender registry 'is necessary to achieve a substantial, legitimate, nondiscriminatory interest' by demonstrating a nexus to resident safety in light of such factors as: the number, nature, and severity of the convictions . . . ." (quoting S.M.C. § 14.09.010). If a landlord is permitted to exclude a sex offender by showing "a nexus to resident safety," why should landlords not be allowed to exclude or even inquire about, for example, prospective tenants convicted for murdering their neighbors or previous landlords?[4] Because

---

[4] Plaintiffs cite *City of Bremerton v. Widell*, 51 P.3d 733, 739 (Wash. 2002), in which the court posited that if a landlord may be held liable for the foreseeable criminal acts of third parties, "[i]t would seem only reasonable that the landlord should at the same time enjoy the right to exclude persons who may foreseeably cause such injury." Under the Ordinance, a landlord is forbidden from even the most routine due

the Ordinance's exceptions undermine the City's stated interests in curbing housing discrimination against those with criminal histories and protecting resident safety, the Ordinance fails the direct advancement test and thus fails intermediate scrutiny. *See Metro Lights*, 551 F.3d at 905.

The Ordinance is also underinclusive in its treatment of federally funded public housing. The relevant exemption provision reads:

> This Chapter 14.09 shall not be interpreted or applied to diminish or conflict with any requirements of state or federal law, including but not limited to Title VIII of the Civil Rights Act of 1968, the Federal Fair Credit Reporting Act, 15 U.S.C. 1681 et seq., as amended; the Washington State Fair Credit Reporting Act, chapter 19.182 RCW, as amended; and the Washington State Criminal Records Privacy Act, chapter 10.97 RCW, as amended. In the event of any conflict, state and federal requirements shall supersede the requirements of this Chapter 14.09.

S.M.C. § 14.09.115(A).

As the district court determined, this provision "appears to exempt federally funded public housing providers from the inquiry provision" of the Ordinance. Because the Ordinance appears to exempt landlords of federally assisted housing from the inquiry provision, the City defies its own

---

diligence as to prior convictions that could put any landlord on notice of easily foreseeable violent criminal acts of certain prospective tenants.

asserted interest in reducing housing discrimination with respect to prospective occupants of federally assisted housing.

The Ordinance is also underinclusive (and illogical to the point of irrationality) in that it allows inquiry as to criminal conduct, but not criminal convictions. As counsel for the City admitted at oral argument, a landlord can ask a prospective tenant if he favors selling heroin to children or assaulting his landlords, but not if he has ever had been convicted of doing so. Oral Arg. at 28:12–28:38. It makes no sense that, for example, a landlord could inquire about a prospective tenant's prior violent behavior or probability of violent behavior toward fellow tenants, but could not inquire about—and could not base a rental decision on—that same prospective tenant's multiple *convictions* for prior violent behavior toward fellow tenants.

In sum, the Ordinance's exceptions concerning registered sex offenders undermine the City's asserted interests in resident safety and in reducing housing discrimination. The Ordinance also does not advance the City's asserted interest in reducing housing discrimination because it is underinclusive with respect to both prospective occupants of federally assisted housing and inquiries about criminal *conduct* rather than *conviction*. Thus, the Ordinance "cannot directly and materially advance" the City's interests because the exemptions "undermine and counteract the interest the government claims it adopted the law to further," and so fails intermediate scrutiny. *Metro Lights*, 551 F.3d at 905 (citation and internal quotation marks omitted).

## B. The Ordinance also does not survive intermediate scrutiny because its speech restrictions are not sufficiently narrow.

To survive intermediate scrutiny, the restriction "must not be 'more extensive than is necessary to serve [the alleged state] interest.'" *Metro Lights*, 551 F.3d at 903 (quoting *Central Hudson*, 447 U.S. at 566). For example, the rules challenged in *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626, 632 (1985) "prohibit[ed] the use of illustrations in advertisements run by attorneys" and "limit[ed] the information that [could] be included in such ads to a list of 20 items." Ohio argued that the rules are "needed to ensure that attorneys . . . do not use false or misleading advertising to stir up meritless litigation against innocent defendants." *Id*. at 643. The Supreme Court held that the challenged rules were overbroad:

> [A]cceptance of the State's argument would be tantamount to adoption of the principle that a State may prohibit the use of pictures or illustrations in connection with advertising of any product or service simply on the strength of the general argument that the visual content of advertisements may, under some circumstances, be deceptive or manipulative. But . . . , broad prophylactic rules may not be so lightly justified if the protections afforded commercial speech are to retain their force. We are not persuaded that identifying deceptive or manipulative uses of visual media in advertising is so intrinsically burdensome that the State is entitled to forgo that task in favor of the more

> convenient but far more restrictive alternative
> of a blanket ban on the use of illustrations.

*Id*. at 649.

Under *Zauderer*, the Ordinance's restrictions on speech are overbroad. The district court "accept[ed] Plaintiffs' interpretation" that the Ordinance "prohibits landlords from asking individuals other than prospective occupants about [prospective occupants'] criminal history, and these conversations are not commercial speech because they are not proposals to engage in commercial transactions." Thus, the Ordinance bans a substantial amount of noncommercial speech under the reasoning that some amount of commercial speech (for example, questions in rental applications asking prospective occupants directly about their criminal histories) may contribute to housing discrimination against people with criminal histories. Such a restriction is unconstitutionally overbroad according to *Zauderer*. *See* 471 U.S. at 649.

The Supreme Court has emphasized the requirement that commercial speech restrictions be no more extensive than necessary especially when a restriction "provides only the most limited incremental support for the interest asserted." *Bolger*, 463 U.S. at 73. In *Bolger*, the challenged restriction on commercial speech "prohibit[ed] the mailing of unsolicited advertisements for contraceptives." *Id*. at 61. An asserted government interest was "aiding parents' efforts to discuss birth control with their children." *Id*. at 73. The Supreme Court, despite recognizing the interest to be "substantial," found that the challenged law "provide[d] only the most limited incremental support for the interest asserted" and that "a restriction of this scope is more extensive than the Constitution permits." *Id.*

Applying *Bolger* to this case reinforces that the Ordinance's restrictions on speech are overbroad. As discussed above, the Ordinance does not directly and materially advance the City's asserted interests because its exemptions undermine those asserted interests, just as the law challenged in *Bolger* provided only "limited incremental support for the interest asserted." *Id.* And just as the *Bolger* Court found that "purging all mailboxes of unsolicited material that is entirely suitable for adults" to achieve such a level of protection goes beyond what the Constitution permits, *id.*, banning a substantial amount of noncommercial speech (contacting third parties without economic interests) for the level of protection offered by the Ordinance is unconstitutionally overbroad.

*Central Hudson* specifically held in its discussion of the narrowness test that the government cannot "completely suppress information when narrower restrictions on expression would serve its interest as well." 447 U.S. at 565. The City thus cannot "completely suppress" one group of citizens from accessing information that is freely available to another group of citizens, when much narrower alternatives to such a drastic measure would serve the City's asserted interests at least as effectively as the Ordinance would.

As the plaintiffs argued, a narrower alternative would be to permit landlords to inquire about prospective occupants' criminal history, but to retain the Ordinance's prohibition on landlords taking adverse actions based on that information. Because this narrower alternative would prohibit landlords from discriminating against people with criminal histories, it would advance the City's objective of "regulat[ing] the use of criminal history in rental housing."

There is yet another narrower alternative.[5]  The City concedes that the Ordinance permits landlords to inquire about and to take adverse actions on the basis of whether a prospective occupant is a sex offender.  But the City asserted that it "took a balanced approach," requiring landlords to "demonstrat[e] a nexus to resident safety" before taking adverse actions based on sex offender offenses.  Because murdering a landlord or other tenants bears at least as heavily on resident safety as sexual assault, the Ordinance could permit landlords to inquire about, and take adverse actions on the basis of, criminal history concerning certain violent offenses (like the murder or assault of landlords or tenants) or certain drug offenses (like selling heroin to children or fellow tenants who were children), using the same "balanced approach" that it uses for sexual offenses.  This alternative could enhance the City's asserted interest in promoting resident safety and would be a narrower speech restriction than the Ordinance's current form, as the alternative would permit landlords to inquire about and act based on one additional form of criminal offense.

\*        \*        \*

The majority opinion holds that the Ordinance is unconstitutional, assuming without deciding that intermediate scrutiny applies.  While I concur with that determination, I believe that *Sorrell* requires us to apply strict scrutiny because the Ordinance is a content- and speaker-based restriction of noncommercial speech, and the Ordinance clearly fails strict scrutiny.

---

[5] This alternative assumes arguendo that the City should be allowed to limit landlords' access to prospective occupants' criminal history information.

GOULD, Circuit Judge, concurring in part and dissenting in part:

I am pleased to concur in Parts I, II, III(A), III(B)(i), and IV of the majority opinion.  I also agree with Judge Wardlaw that Seattle's inquiry provision regulates commercial speech and is subject to intermediate scrutiny.  I respectfully dissent, however, from the majority's conclusion that the inquiry provision is not narrowly tailored, and from the resulting judgment that the provision is unconstitutional.[1]  *See* Part III(B)(ii).  In my view, the opinion's reasoning on this point is unpersuasive and out of line with commercial speech precedent.  I would instead hold that the inquiry provision survives intermediate scrutiny and affirm the district court in full.

# I

Along with Judge Wardlaw, I conclude that the inquiry provision regulates commercial speech.  The majority opinion, assuming this point without deciding, dutifully recites the familiar standards of such scrutiny: that Seattle bears the burden of showing that the inquiry provision "directly advances" a "government interest [that] is substantial" in a way that "is not more extensive than is necessary to serve that interest."  Op. at 19 (citations omitted).  And the opinion rightly concludes that the inquiry provision directly advances Seattle's two undisputedly substantial interests: "reducing barriers to housing faced by persons with criminal records and the use of criminal history

---

[1] In light of today's result, I also agree with the court that remand to the district court to consider severability is appropriate.  However, as I conclude in this dissent that Seattle's ordinance does not violate the constitution, I contend that remand is unnecessary.

as a proxy to discriminate on the basis of race." Op. at 20–23.

Unfortunately, that's when the opinion loses me. The opinion goes on to say that Seattle's inquiry provision is not narrowly tailored because there are two other types of housing ordinances that have recently been enacted by a handful of other jurisdictions "to achieve the same goals of reducing barriers to housing and racial discrimination as Seattle." Op. at 25. It then summarizes the provisions of these ordinances, both of which allow landlords to access some (or all) of a prospective tenant's criminal record. Op. at 25–27. It expressly reserves the question of whether these alternative provisions are even constitutional, Op. at 25, but nonetheless faults Seattle for allegedly "tenuous" reasoning in declining to adopt an earlier version of its inquiry provision that resembled these alternatives, Op. at 27–28. In conclusion, the opinion holds that, because these alternatives (1) "appear[] to meet Seattle's housing goals," but (2) are "significantly less burdensome on speech," they thus (3) show that the inquiry provision is not narrowly tailored. Op. at 28.

I respectfully do not join this line of reasoning as it raises far more questions than answers about what exactly is wrong with the inquiry provision. Below, I highlight the three main areas where I contend the opinion falls short.

*First*, the opinion's assertion that the alternative laws "appear[] to meet Seattle's housing goals" is all well and good, but there is nothing in the record (or otherwise) from which we could reasonably reach that conclusion. The fact that five cities, one county, and the State of New Jersey enacted these alternative measures in an attempt to address some of the same issues as Seattle does not mean that they

*will* "accomplish the same goals[.]"  Op. at 23 (citing *Ballen v. City of Redmond*, 466 F.3d 736, 743 (9th Cir. 2006)).  In fact, the majority identifies no data or evidence that these alternatives have been, or will be, effective *at all*, let alone as effective as Seattle's inquiry provision.  The opinion's reasoning rests entirely on one federal panel's take as to what works in housing policy based on summaries of statutes alone.  How is this anything other than a federal court "second-guess[ing]" the considered judgment of a democratically elected local government?  *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 478 (1989).

And it is a dubious take at that.  If anything, it is more reasonable to assume that the alternatives will be *less* effective.  Both alternatives permit landlords to access at least some of a prospective tenant's criminal history.  Taking seriously the notion that permitting landlords to access criminal history would make it *"extremely difficult to enforce"* the law's prohibition on discrimination—as the opinion does, albeit elsewhere, Op. at 23 n. 16 (emphasis added)—these alternatives open the door for more undetectable (and unenforceable) violations.  How does the mere existence of *less* effective alternative laws demonstrate that there are "*numerous* and *obvious* less-burdensome alternatives" that would accomplish the same goals as the inquiry prohibition?[2]  *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n. 13 (1993) (emphasis added).

---

[2] Moreover, the opinion is not even sold on the constitutionality of these alternatives.  They appear to raise distinct constitutional issues of their own that are not before us, nor have been tested in any other court as far as I can tell.  The opinion does not persuade me that a law of uncertain constitutionality is an "obvious" alternative.

*Second*, the opinion's reasoning as to the inquiry provision's burden on speech is lacking. "In general, 'almost all of the [commercial speech] restrictions disallowed under [the narrow tailoring] prong have been *substantially excessive*, disregarding *far* less restrictive and more precise means.'" *Hunt v. City of Los Angeles*, 638 F.3d 703, 717 (9th Cir. 2011) (quoting *Fox*, 492 U.S. at 479) (emphasis added). Courts have struck down only those laws that go "*much further* than is necessary to serve the interest asserted." *See, e.g., Matal v. Tam*, 137 S. Ct. 1744, 1765 (2017) (emphasis added) (holding law prohibiting "trademarks like . . . 'Down with racists,' 'Down with sexists,' 'Down with homophobes'" was not narrowly tailored to interest in preventing disparaging language from disrupting the orderly flow of commerce); *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 948 (9th Cir. 2011) (en banc) (holding law "prohibit[ing] 'signbearers on sidewalks seeking patronage or offering handbills'" was not narrowly tailored to interest in promoting the flow of traffic in the streets).[3]

On this front, the opinion takes issue with the fact that the inquiry provision bars landlords from accessing records of a prospective tenant's recent or violent offenses. Op. at 27. But one of Seattle's substantial interests is reducing

---

[3] The same is true for the examples relied on by Judge Bennett's partial concurrence. *See Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626 (1985) (holding bans on illustrations and non-approved information in attorney advertisements were not narrowly tailored to interest in combatting manipulative advertisements intended to stir up litigation); *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 61, 73–74 (1983) (holding ban on "unsolicited advertisements for contraceptives" was not narrowly tailored to interest in "aiding parents' efforts to discuss birth control with their children.").

discrimination against *anyone* with a criminal record—not just those with old or nonviolent records. Restricting access to records of recent or violent offenses is at the core of, and no less necessary to accomplishing, Seattle's aims than restricting access to older and less violent criminal records. How is restricting access to information at the heart of the discrimination that Seattle aims to eliminate "substantially excessive" in relation to Seattle's goals? *Hunt*, 638 F.3d at 717. How would excluding such records from the scope the inquiry provision make Seattle's law "more precise"? *Id.*

Finally, the opinion's characterization of Seattle's reasoning in enacting the inquiry provision as "tenuous" is unfounded. The record before us links to a public recording of the hearing at which Seattle considered whether the inquiry provision should include recent offenses.[4] At this hearing, the proponent of an amendment to include recent offenses in the provision's scope noted that (1) widespread access to criminal records is a modern phenomenon, yet (2) there was "no evidence" in the studies or other evidence before the city that this change in access led to better (or worse) outcomes for landlords or tenants. Accordingly, the proponent reasoned that access to criminal records—new or old—had only opened the door to unwarranted discrimination. The record shows that several other members of Seattle's city council endorsed this view. After a considered discussion, the change was adopted unanimously, as was the ultimate legislation later.

---

[4] City of Seattle, Civil Rights, Utilities, Economic Development, and Arts Committee (Aug. 8, 2017), https://www.seattlechannel.org/mayor-and-council/city-council/2016/2017-civil-rights-utilities-economic-develop ment-and-arts-committee/?videoid=x79673 at 1:02:15–1:17:50.

What exactly about Seattle's reasoning was "tenuous"? It (roughly) echoes a line of reasoning familiar to this Court: a conclusion reached after evaluating the results of a kind of "natural experiment" created by a change in circumstances. *Cf. McShannock v. JP Morgan Chase Bank NA*, 976 F.3d 881, 892 (9th Cir. 2020) (noting natural experiment created by change of law in Second Circuit). Here, Seattle reached its conclusion after comparing the evidence before it on the state of the rental market before, and after, the advent of widespread access to criminal records. The opinion may disagree with Seattle's read of this evidence, but it does not explain how it came to that conclusion. That is an unpersuasive basis for overruling Seattle's considered effort to tackle a vexing local issue.

## II

I believe our precedent requires us to uphold the inquiry provision. There is a "reasonable" fit between the inquiry provision and Seattle's aims. *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 632 (1995). And Seattle's version of the inquiry provision is not "substantially excessive" in relation to Seattle's goals. *Hunt*, 638 F.3d at 717. The inquiry provision restricts only landlords' access to prospective tenants' criminal records—the precise information upon which Seattle wants to stop landlord discrimination. It goes no further. It does not bar landlord inquiries into a prospective tenant's rental history, income history, character references, job history, *etc.* A landlord could ask for references from recent landlords. A landlord could ask previous landlords "Hey, did this tenant ever do anything to make you or your other tenants feel unsafe?" "These ample alternative channels for receipt of information about" prospective tenants' ability to safely and successfully lease

an apartment demonstrate that the law's sweep is neither disproportionate nor imprecise. *Fla. Bar*, 515 U.S. at 634.

The targeted nature of the inquiry provision is analogous to a recent Third Circuit case upholding an inquiry prohibition on prospective job applicants' salary history. *Greater Phila. Chamber of Com. v. City of Phila.*, 949 F.3d 116, 154 (3d Cir. 2020). There, the Third Circuit held that the law at issue was narrowly tailored to Philadelphia's interest in remedying wage discrimination and promoting wage equity as the law "only prohibits employers from inquiring about a single topic, while leaving employers free to ask a wide range of other questions," and it does so only "at a specific point in time—after a prospective employee has applied for a job and before s/he is hired[.]" *Id.* I believe the Third Circuit's reasoning is far more grounded in both the facts of the case and in commercial speech precedent than that of today's result.

The alternatives offered by the landlords, and the opinion, do not undermine the constitutionality of the inquiry provision. For all the reasons set forth in the opinion's footnote 16, *see* Op. at 23 n.16, the landlords' alternatives do not proportionately and adequately address Seattle's aims. And, as set forth in the preceding section, there is no basis from which we could reasonably conclude that the majority's alternatives would achieve Seattle's aims. The alternatives simply do less. Here, the district court got it exactly right:

> Plaintiffs argue that [Seattle] should have pursued different objectives: perhaps allowing landlords to continue to reject any tenant based on criminal history so long as the landlord makes an individualized

assessment of each tenant's criminal history or perhaps prohibiting landlords from considering non-violent crimes or crimes committed several years ago but allowing them to consider recent crimes. Reasonable people could disagree on the best approach, but the Court's role is not to resolve those policy disagreements; it is to determine whether there are numerous obvious and less burdensome methods of achieving the City's objectives.

If the Court were to accept Plaintiffs' logic, it would mean that commercial speech restrictions would rarely survive constitutional challenge because plaintiffs could always argue the government should have applied a restriction to fewer people. If, for example, the City had enacted Plaintiffs' proposal to prohibit landlords from asking about only crimes that were more than two years old, another plaintiff could argue that it should have been three years, or three-and-a-half, or four, and so on.

*Yim v. City of Seattle*, 2021 WL 2805377, at *13–14 (W.D. Wash. July 6, 2021).  Today's result opens the door to exactly this kind of vicious cycle.

## III

The record before us shows that Seattle's elected officials did precisely what intermediate scrutiny asks them to do: "carefully calculate[] the costs and benefits associated with the" inquiry provision. *Discovery Network*, 507 U.S. at

417 (cleaned up). Seattle's representatives compiled and considered data, studies, and public input on this issue. They talked through their reasoning. And they ultimately reached a consensus. The inquiry provision may or may not be "the single best" solution to Seattle's problems, *Fox*, 492 U.S. at 480, but it is a reasonable, informed, and targeted attempt. That is all our precedent asks. For that and the foregoing reasons, I respectfully dissent from the decision to strike down the inquiry provision.