Filed 5/17/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ABDU LKADER AL SHIKHA, | B321882 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 20STCV14928) |
| v. | |
| LYFT, INC., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Peter A. Hernandez, Judge. Affirmed.

McLachlan Law and Michael D. McLachlan for Plaintiff and Appellant.

Horvitz & Levy, Jason R. Litt, Rebecca G. Powell; Sheppard Mullin Richter & Hampton, Paul S. Cowie, Rachel J. Moroski and Nina Montazeri for Defendant and Respondent.

————————————————

Abdu Lkader Al Shikha was working as a Lyft driver when a passenger attacked him, stabbing his hand and legs. The attack was sudden and unprovoked. Unbeknownst to Al Shikha, the passenger had a criminal record. Although Lyft conducts criminal background checks on its drivers, it does not similarly screen passengers. Al Shikha sued Lyft for negligence based on the rideshare company's failure to conduct criminal background checks on all passengers. The trial court granted Lyft's motion for judgment on the pleadings.

We conclude Al Shikha has not established that Lyft's legal duty to its drivers extends to conducting criminal background checks on all riders seeking to use the service. We therefore affirm the trial court judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**[1]

In February 2020, Al Shikha was working as a Lyft driver when he accepted a ride request through the Lyft app from passenger Ricky A. Alvarez. During the ride, and without any warning or provocation, Alvarez repeatedly stabbed Al Shikha, causing lacerations to Al Shikha's left hand and both legs. In April 2020, Al Shikha filed a complaint asserting three causes of action against Lyft: (1) failure to provide workers' compensation

---

[1] Consistent with the standard of review, we assume the truth of the properly pleaded allegations stated in Al Shikha's complaint. (*National Shooting Sports Foundation, Inc. v. State of California* (2018) 5 Cal.5th 428, 432–433 (*National Shooting Sports*).)

insurance; (2) negligence; and (3) failure to provide a safe place of employment.[2]

It is undisputed that Public Utilities Code section 5445.2 and Business and Professions Code section 7458 require Lyft to conduct background checks on drivers. The California Public Utilities Commission has issued Lyft a permit to operate as a Transportation Network Company (TNC) in California. Public Utilities Code section 5445.2, subdivision (a)(1), provides that TNCs must conduct, or have a third party conduct, "a local and national criminal background check for each participating driver . . . ."

Public Utilities Code section 5445.2 prohibits TNCs from employing, contracting with, or retaining drivers with certain convictions. The disqualifying convictions include violent felonies within the meaning of Penal Code section 667.5, human trafficking under Penal Code section 236.1, and several terrorism-related offenses. Other enumerated convictions preclude an individual from driving for a TNC if the offense occurred within the previous seven years. The list includes driving under the influence of alcohol or drugs and several bribery offenses. (Pub. Util. Code, § 5445.2, subd. (a)(2)–(3).) Business and Professions Code section 7458 also requires TNCs to conduct a criminal background check for each "app-based driver," and forbids TNCs from using drivers who have specific prior convictions. (Bus. & Prof. Code, § 7458, subds. (a) & (c).) In addition to the disqualifying convictions listed in Public Utilities Code section 5445.2, the provision adds "serious felonies" (Pen.

---

[2] Al Shikha voluntarily dismissed the third cause of action. The complaint also includes a fourth cause of action for battery against Alvarez, who is not a party to this appeal.

Code, § 1192.7, subd. (c)) and "any hate crimes" (Pen. Code, § 422.55).

The complaint alleges Alvarez has a "long history of criminal convictions," including "charges for drugs, theft, and illegal weapons charges, all of which are a matter of public record." There are no other allegations about the nature of Alvarez's convictions or his criminal history.

According to the complaint, Lyft has a "contractual pre-existing relationship" with its passengers, so it has the "opportunity" to conduct background checks on them before they summon a ride. Lyft knows that passengers have committed crimes against drivers for Lyft, Uber, taxicabs, and common carriers. However, Lyft does not conduct "basic, inexpensive public record background checks on passengers to determine whether they pose a risk of harm to drivers (or to obtain consent from drivers that they may be transporting a known criminal)." The complaint asserts that if Lyft had conducted a background check on Alvarez, it would have known of his criminal background, and it "should have advised [Al Shikha] of [the] same."

Lyft moved for judgment on the pleadings on the first two causes of action, asserting it had no legal duty to conduct background checks on passengers and therefore was not negligent. Al Shikha opposed the motion. He argued, in part, that the motion impermissibly asked the court to make factual determinations. He did not seek leave to amend the complaint.

The trial court granted Lyft's motion. The court concluded Al Shikha could not establish a claim for negligence as a matter of law because Lyft lacked either a statutory or a common law duty to conduct criminal background checks on passengers. The

4

court also determined that the Investigative Consumer Reporting Agencies Act (ICRAA) prohibits Lyft from conducting background checks on passengers. Finally, the court reasoned that Lyft had rebutted the presumption of negligence, thus defeating the claim that it was liable for failing to provide Al Shikha workers' compensation insurance.

In May 2022, the trial court issued a judgment of dismissal. Al Shikha timely appealed.

## DISCUSSION

### I. Standard of Review

A judgment on the pleadings in favor of a defendant is appropriate when the complaint fails to allege facts sufficient to state a cause of action. (Code Civ. Proc., § 438, subd. (c)(3)(B)(ii).) "In reviewing an order granting or denying a motion for judgment on the pleadings, we accept as true all material allegations in the complaint" (*National Shooting Sports*, *supra*, 5 Cal.5th at pp. 432–433), but not contentions, deductions, or conclusions of law (*Adams v. Bank of America, N.A.* (2020) 51 Cal.App.5th 666, 670–671 (*Adams*)). We independently review the trial court's ruling. If the ruling is correct on any applicable theory of law, we will affirm. (*Tukes v. Richard* (2022) 81 Cal.App.5th 1, 18–19.)

### II. Request for Judicial Notice

As an initial matter, we consider Al Shikha's request that we take judicial notice of three documents: (1) Lyft's Terms of Service, found on its website; (2) safety-related information from Lyft's website; and (3) Lyft's Community Safety Report, which Al Shikha obtained from a website of unknown origin. Lyft has opposed the request for judicial notice.

Al Shikha fails to provide a valid statutory basis for this court to take judicial notice of the documents. He cites Evidence

5

Code section 452, subdivision (d), which authorizes us to take judicial notice of court records, but there is no indication these documents are court records. Further, while Al Shikha recognizes that "[w]e may not take judicial notice of the truth of the contents of a website" (*LG Chem, Ltd. v. Superior Court* (2022) 80 Cal.App.5th 348, 362, fn. 7), he nonetheless requests that we take judicial notice of the truth of portions of the documents. For example, he asserts the Terms of Service demonstrate that Lyft "can (and now does) obtain rider consent for background checks." Similarly, he asserts the proffered documents are relevant to demonstrate Lyft's "knowledge of and general state of mind regarding safety issues . . . ." However, "[t]he contents of . . . Web sites . . . are 'plainly subject to interpretation and for that reason not subject to judicial notice.' [Citation.]" (*Ragland v. U.S. Bank National Assn.* (2012) 209 Cal.App.4th 182, 194.)

We additionally note that Al Shikha neither asked the trial court to take judicial notice of these documents nor presented them in any form below. "Reviewing courts generally do not take judicial notice of evidence not presented to the trial court." (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3.) "In exceptional circumstances, an appellate court can, but is not required to, take judicial notice of material that was not presented to the trial court in the first instance." (*Adams, supra,* 51 Cal.App.5th at p. 673, fn. 4.) Al Shikha presents no such exceptional circumstances here.

We deny the request for judicial notice.

### III. The Duty to Protect Others from Third Party Conduct

"To establish a cause of action for negligence, the plaintiff must show that the 'defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury.' [Citation.] Recovery for negligence depends as a threshold matter on the existence of a legal duty of care." (*Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 213 (*Brown*).) "Whether a duty exists is a question of law to be resolved by the court." (*Ibid.*)

"In general, each person has a duty to act with reasonable care under the circumstances." (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 619 (*Regents*).) "However, 'one owes no duty to control the conduct of another, nor to warn those endangered by such conduct.' [Citation.]" (*Ibid.*; accord, *Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 235.) While "there is generally no duty to protect others from the conduct of third parties[,] [t]he 'special relationship' doctrine is an exception to this general rule." (*Regents*, at p. 627.) "In a case involving harm caused by a third party, a person may have an affirmative duty to protect the victim of another's harm if that person is in what the law calls a 'special relationship' with either the victim or the person who created the harm." (*Brown, supra,* 11 Cal.5th at p. 215.) A "special relationship between the defendant and the victim is one that 'gives the victim a right to expect' protection from the defendant . . . ." (*Id.* at p. 216.) "The existence of such a special relationship puts the defendant in a unique position to protect the plaintiff from injury. The law requires the defendant to use this position accordingly." (*Ibid.*)

If the court determines there is a special relationship between the parties, "or some other set of circumstances giving rise to an affirmative duty to protect," the court must then "consult the factors described in *Rowland* [*v. Christian* (1968) 69 Cal.2d 108 (*Rowland*)] to determine whether relevant policy considerations counsel limiting that duty." (*Brown, supra,* 11 Cal.5th at p. 209.)

Lyft concedes that it was in a special relationship with Al Shikha when the attack occurred.[3] We therefore must consider whether the *Rowland* factors indicate the duty arising out of that special relationship should be limited.

## IV. The *Rowland* Factors Favor Limiting the Duty of Care to Exclude an Obligation to Conduct Criminal Background Checks on All Passengers

Even where there is a special relationship, the general rule of duty may be limited if "policy considerations clearly require an exception." (*Regents, supra,* 4 Cal.5th at p. 628.) The *Rowland* factors are "a means for deciding whether to limit a duty derived from other sources." (*Brown, supra,* 11 Cal.5th at p. 217.)

"To depart from the general principle that all persons owe a duty of care to avoid injuring others . . . 'involves the balancing of a number of considerations': 'the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct

---

[3] Al Shikha argues the special relationship is based on employment. Lyft does not concede Al Shikha was or is an employee, but acknowledges a special relationship may arise from an independent contractor or other type of relationship. Because of Lyft's concession, we need not address whether Al Shikha was Lyft's employee at the time of the incident.

8

and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.' [Citation.]" (*Brown*, *supra*, 11 Cal.5th at p. 217, citing *Rowland*, *supra*, 69 Cal.2d at pp. 112–113; accord, *Kuciemba v. Victory Woodworks, Inc.* (2023) 14 Cal.5th 993, 1021 (*Kuciemba*).)

As our Supreme Court has explained, these "*Rowland* factors fall into two categories. The first group involves foreseeability and the related concepts of certainty and the connection between plaintiff and defendant. The second embraces the public policy concerns of moral blame, preventing future harm, burden, and insurance availability. The policy analysis evaluates whether certain kinds of plaintiffs or injuries should be excluded from relief." (*Regents*, *supra*, 4 Cal.5th at p. 629; *Kuciemba*, *supra*, 14 Cal.5th at p. 1021.)

We consider the *Rowland* factors at " 'a relatively broad level of factual generality.' [Citation.]" (*Regents*, *supra*, 4 Cal.5th at p. 628; accord, *Kuciemba*, *supra*, 14 Cal.5th at p. 1021.) Therefore, "we determine 'not whether they support an exception to the general duty of reasonable care on the facts of the particular case before us, but whether carving out an entire category of cases from that general duty rule is justified by clear considerations of policy.' [Citation.] In other words, the duty analysis is categorical, not case specific." (*Regents*, at p. 629.)

Before analyzing the *Rowland* factors, we must identify the specific duty Al Shikha asserts Lyft should undertake. (*Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1214 (*Castaneda*).)

9

The complaint alleges Lyft has a duty to conduct "basic, inexpensive public record background checks on passengers to determine whether they pose a risk of harm to drivers (or to obtain consent from drivers that they may be transporting a known criminal)." On appeal, Al Shikha argues Lyft is required to "either warn drivers about riders with serious criminal histories[ ] or otherwise exclude such riders from its network." He further asserts that Lyft should exclude or warn drivers about passengers who have been convicted of any of the crimes that would prevent individuals from driving for a TNC pursuant to Business and Professions Code section 7458 and Public Utilities Code section 5445.2. Al Shikha suggests Lyft could simply warn drivers that a potential rider did not pass a criminal background screening. According to Al Shikha, once warned, "[t]he driver then has the choice of accepting the ride or not."

### A. Sliding-scale balancing formula

" 'The most important factor to consider in determining whether to create an exception to the general duty to exercise ordinary care . . . is whether the injury in question was *foreseeable*.' [Citations.]" (*Regents*, *supra*, 4 Cal.5th at p. 629.) In assessing the *Rowland* factors in cases involving a defendant's duty to prevent third party criminal conduct, courts have employed a "sliding-scale balancing formula." (*Hanouchian v. Steele* (2020) 51 Cal.App.5th 99, 109 (*Hanouchian*).)

As the California Supreme Court explained in *Verdugo v. Target Corp.* (2014) 59 Cal.4th 312 (*Verdugo*), "In evaluating whether a business is under a duty to provide precautionary measures to protect patrons against potential third party criminal conduct, past California cases generally have looked primarily to a number of factors, including (1) the degree of

foreseeability that the danger will arise on the business's premises and (2) the relative burden that providing a particular precautionary measure will place upon the business. [Citations.] If the relative burden of providing a particular precautionary safety or security measure is onerous rather than minimal, the governing cases have held that absent a showing of a 'heightened' or 'high degree' of foreseeability of the danger in question, it is not appropriate for courts to recognize or impose a common law duty to provide the measure. [Citations.] These decisions implicitly recognize that, in the absence of such heightened foreseeability, the determination whether a business (or businesses in general) should be required to provide a costly or burdensome precautionary safety measure to protect against potential future third party criminal conduct should more appropriately be made by the Legislature rather than by a jury applying a general reasonableness standard in a particular case." (*Id.* at pp. 338–339.)

Thus, for example, in *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666 (*Ann M.*), disapproved of on another ground by *Reid v. Google, Inc.* (2010) 50 Cal.4th 512 at page 527, footnote 5, an unknown assailant raped the plaintiff at the store where she worked. The plaintiff sued the defendant owner of the shopping center, alleging the defendant was negligent for failing to provide security patrols in the shopping center's common areas. (*Ann M.*, at pp. 671, 673.) Our high court determined that although the defendant owed a duty of care to the plaintiff due to the landowner-tenant and landowner-patron relationship, that duty was limited.

The court explained that the scope of a landlord's duty to provide protection from foreseeable third party crime "is

11

determined by a balancing of 'foreseeability' of the criminal acts against the 'burdensomeness, vagueness, and efficacy' of the proposed security measures." (*Ann M.*, *supra*, 6 Cal.4th at p. 679.)  The court concluded hiring security guards would rarely be a minimal burden.  Not only are the monetary costs "not insignificant," "the obligation to provide patrols adequate to deter criminal conduct is not well defined.  'No one really knows why people commit crime, hence no one really knows what is "adequate" deterrence in any given situation.'  [Citation.]  Finally, the social costs of imposing a duty on landowners to hire private police forces are also not insignificant.  [Citation.]  For these reasons, we conclude that a high degree of foreseeability is required in order to find that the scope of a landlord's duty of care includes the hiring of security guards.  We further conclude that the requisite degree of foreseeability rarely, if ever, can be proven in the absence of prior similar incidents of violent crime on the landowner's premises.  To hold otherwise would be to impose an unfair burden upon landlords and, in effect, would force landlords to become the insurers of public safety, contrary to well-established policy in this state." (*Ibid.*)

The plaintiff in *Ann M.* failed to establish the requisite high degree of foreseeability since there was no evidence the defendant was aware of prior assaults and robberies at the shopping center and prior reported incidents of crime were not similar to the assault the plaintiff suffered.  Evidence that transients were present near the shopping center and statistical rates of crime in the surrounding area also failed to satisfy the plaintiff's burden to show a high degree of foreseeability.  (*Ann M.*, *supra*, 6 Cal.4th at pp. 679–680.)

In *Sharon P. v. Arman, Ltd.* (1999) 21 Cal.4th 1181 (*Sharon P.*), disapproved of on other grounds by *Reid v. Google, Inc.*, *supra*, 50 Cal.4th at page 527, footnote 5, and *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826 at page 853, footnote 19, our high court again considered the scope of a landlord's duty to prevent third party criminal conduct. An unknown assailant sexually assaulted the plaintiff at gunpoint in the defendants' underground parking garage. (*Sharon P.*, at p. 1185.) The plaintiff alleged the violent attack was sufficiently foreseeable to impose a duty on defendants to adopt various safety measures, such as security guards, bright lights, working security cameras, and periodic walk-throughs by defendants' employees. (*Id.* at p. 1189.) The plaintiff asserted prior robberies of the bank on the first floor of the building, crimes in the neighborhood surrounding the building, and the deteriorated, dark condition of the garage, including non-functioning security cameras, all demonstrated the foreseeability of a violent crime occurring in the garage. (*Id.* at pp. 1186, 1189.)

Following the reasoning of *Ann M.*, our high court concluded the plaintiff did not establish the high level of foreseeability necessary to impose a duty to hire security guards. The court reasoned that the prior bank robberies were not sufficiently similar to the sexual assault on the plaintiff to justify such an obligation, and the statistical crime rate in the area around the building also did not establish the requisite foreseeability. (*Sharon P.*, *supra*, 21 Cal.4th at p. 1191.) As to the other measures the plaintiff proposed, the court concluded: "It is difficult to quarrel with the abstract proposition that the provision of improved lighting and maintenance, operational surveillance cameras and periodic walk-throughs of the tenant

13

garage owned and operated by defendants might have diminished the risk of criminal attacks occurring in the garage.  But absent any prior similar incidents or other indications of a reasonably foreseeable risk of violent criminal assaults in that location, we cannot conclude defendants were required to secure the area against such crime." (*Id*. at p. 1199.)

Perhaps most relevant for this case, in *Castaneda*, the plaintiff was injured by a stray bullet during a gang-related confrontation at the mobile home park where he lived. (*Castaneda*, *supra*, 41 Cal.4th at pp. 1211–1212.)  He sued the landlords, arguing they had a duty not to rent to gang members, or a duty to evict gang members when they harassed other tenants.  (*Id*. at p. 1209.)  The plaintiff's argument included the claim that if a rental applicant appeared to be a gang member, the landlords should obtain the applicant's criminal record to determine if the applicant was in fact gang involved.  (*Id*. at p. 1217.)

The *Castaneda* court acknowledged the dangers of violent street gangs, and that gang activity can often subject residents at a particular location to "unacceptable levels of fear and risk." (*Castaneda*, *supra*, 41 Cal.4th at p. 1216.)  However, because the duty the plaintiff proposed—withholding rental units from actual or perceived gang members—was of an "extraordinarily burdensome nature" and had significant social costs, the court concluded that "[a]bsent circumstances showing extraordinary foreseeability," it would decline to recognize such a duty.  (*Id*. at pp. 1218, 1216.)  In assessing the burden of obtaining criminal histories of applicants when a landlord suspected the potential tenants might be gang members, the court noted that requiring such screening would expose landlords to potential liability for

14

failing to conduct a sufficient inquiry, or for misjudging the criminal record as not reflecting a strong propensity for gang violence if such violence later occurred. (*Id*. at p. 1217.) The court also noted "liability for discrimination could arise if the landlord treated applicants differently, depending on their ethnicity, family composition, or appearance, either in deciding whether to obtain a criminal history or in deciding what prior convictions and arrests would disqualify an applicant." (*Ibid*.)

The court further explained: "The alternative [to selectively obtaining applicant criminal histories]—obtaining full histories on all applicants and their families, and refusing to rent to anyone with arrests or convictions for any crime that could have involved a gang—would involve significant expense and delay for the landlord and unfairly deprive many Californians of housing. Nor is the proposed screening likely to be especially effective; juvenile court records, which are generally confidential by law (Welf. & Inst. Code, § 827), are presumably not available through the services plaintiff recommends, and even adult criminal records do not necessarily reflect the circumstances of the crime from which a landlord could reliably decide whether renting to the applicant poses a threat of gang violence. We decline to impose such a burdensome, dubiously effective and socially questionable obligation on landlords, at least absent circumstances making gang violence extraordinarily foreseeable." (*Castaneda*, *supra*, 41 Cal.4th at p. 1217.)

Numerous courts of appeal have similarly considered the degree of foreseeability and the relative burden of proposed precautionary measures in determining whether the scope of a defendant's duty of care should be extended to require such measures. In *Hanouchian*, two men attacked the plaintiff

15

without provocation or warning at a sorority party at the defendants' off-campus residence. A panel of this court considered whether the defendants' duty of care to the plaintiff as an invitee encompassed an obligation to take precautionary measures, including screening guests entering the event, permitting check-ins by university police, and hiring private security. (*Hanouchian*, *supra*, 51 Cal.App.5th at p. 109.)

The court concluded these three proposed measures in particular would be highly burdensome, requiring a heightened degree of foreseeability. The complaint asserted the defendants were aware of past violent incidents at university fraternal organization events. But it did not allege the defendants were aware of prior similar incidents at their sorority specifically, or that the defendants had actual knowledge of the perpetrators' violent propensities that would have warranted their exclusion from the party. The plaintiff's complaint thus failed to allege facts sufficient to establish the requisite foreseeability of violent attacks like the one he suffered. (*Hanouchian*, *supra*, 51 Cal.App.5th at p. 113.)

Other courts have reached similar conclusions in circumstances involving sudden, unexpected, violent criminal conduct. (E.g., *Williams v. Fremont Corners, Inc.* (2019) 37 Cal.App.5th 654 (*Williams*) [plaintiff attacked in parking lot of bar; insufficiently foreseeable to warrant preventative measures of uncertain efficacy]; *Melton v. Boustred* (2010) 183 Cal.App.4th 521 [plaintiffs attacked at a party by unknown assailants; hiring security guards and restricting guest list would pose significant burden and attack was not reasonably foreseeable].)

16

### 1. Conducting criminal background checks on all passengers would be highly burdensome

Al Shikha contends conducting criminal background checks on all potential rideshare passengers would entail minimal costs and would not be highly burdensome. Lyft, in contrast, asserts the obligation would impose significant financial and social burdens. Lyft argues screening each passenger would require a "huge and unwieldy infrastructure"; that it would expose Lyft to liability because there is no guarantee it would successfully identify people inclined to violence; it would be impossible for passengers to download and sign up for the app at the time a ride is needed; it would burden those with criminal histories who are not inclined to violence but still need transportation; it would unfairly discriminate against broad segments of the population; it would have an "unfair or even unlawful[ly] discriminatory effect on minorities and marginalized populations"; and it would conflict with the strong public policy of maintaining consumer privacy.

As the court determined in *Castaneda*, we similarly conclude here that conducting criminal background checks on all rideshare passengers would be "a burdensome, dubiously effective and socially questionable obligation . . . ." (*Castaneda, supra*, 41 Cal.4th at p. 1217.)

Because of the procedural posture of this case, there was no evidence before the trial court regarding the actual costs or conceivable logistics of Lyft conducting a criminal background check on every passenger who seeks to use the platform. However, accepting as true the complaint's allegation that Lyft could conduct criminal background checks on passengers "for

17

very little cost if it chose to do so," that allegation does not end the analysis.

To the extent Al Shikha has alleged or now argues that Lyft's duty is not only to conduct criminal background checks but also to either exclude passengers with certain criminal histories, or to warn drivers about such passengers, the burden would still be significant. Beyond simply obtaining a criminal history, some form of analysis would be necessary to identify what specific prior convictions appear in a passenger's criminal history. (See *Sharon P.*, *supra*, 21 Cal.4th at p. 1196 [questionable that surveillance cameras would be less burdensome than hiring security guards since they "may be ineffectual to protect against crime unless there are employees who are available to continuously monitor video transmissions and respond effectively when suspicious or criminal behavior is observed"].) Moreover, Al Shikha's assertion that Lyft would incur only insignificant additional costs since it already obtains criminal background checks of drivers, appears to ignore the much larger volume of criminal background checks that would be necessary to screen every potential passenger.[4]

---

[4] Further, to the extent Al Shikha suggests Lyft should exclude or warn of passengers with any type of criminal history, the measure would be extremely overinclusive. This would create a different heavy burden in that a significant number of passengers would be subject to exclusion from using the rideshare service, no matter how unrelated their criminal histories are to a predisposition to commit violent attacks on a driver. Even if the obligation were limited to excluding or warning about passengers with prior convictions that would prohibit them from driving on a rideshare platform, the list of disqualifying convictions includes numerous offenses that would appear to have no predictive value in determining whether a

(*Castaneda*, *supra*, 41 Cal.4th at p. 1217 [obtaining full criminal histories on all applicants and their families would involve "significant expense and delay"]; *Hanouchian*, *supra*, 51 Cal.App.5th at pp. 109–110 [screening party guests is highly burdensome measure].)

Even assuming there would be no significant financial or logistical burdens associated with conducting a criminal background check on every rideshare passenger, there are significant negative social costs to creating an obligation to obtain criminal histories of potential patrons to exclude them from participating in a widely available service.  In 2017, the Legislature explained that "[r]oughly seven million Californians, or nearly one in three adults, have an arrest or conviction record . . . ."  (Assem. Bill No. 1008 (2017–2018 Reg. Sess.) § 1, subd. (f).) And in areas such as employment and housing, national, state, and local governments have taken steps to *limit* the use of criminal history as a basis to exclude individuals.

Our state Legislature, for example, has joined federal agencies and numerous states, counties, and cities, in enacting legislation or regulations restricting the use of criminal histories in employment decisions.  (Assem. Bill No. 1008 (2017–2018 Reg. Sess.) § 1, subds. (a)–(c).)  Under Government Code section 12952, the Fair Chance Act, employers generally may not ask about a job candidate's criminal history before making a conditional job offer.  (Gov. Code, § 12952, subd. (a)(1),(2).) Further, to reject an applicant based on criminal background, the

---

passenger is likely to perpetrate violence on a driver.  (See, e.g., Pub. Util. Code, § 5445.2, subd. (a)(3)(C), (D) [driving under the influence; giving or offering a bribe to an executive officer (Pen. Code, § 67); false personation (Pen. Code, § 530)].)

19

employer must "make an individualized assessment of whether the applicant's conviction history has a direct and adverse relationship with the specific duties of the job that justify denying the applicant the position."  (Gov. Code, § 12952, subd. (c)(1)(A).)

Similarly, cities across the country have enacted ordinances curtailing or imposing restrictions on a landlord's ability to ask housing applicants about their criminal histories or to use criminal history as a basis to deny a housing application.  As in the area of employment, many of these ordinances require an individualized assessment before a landlord may deny housing based on the applicant's criminal history.  (See *Yim v. City of Seattle* (9th Cir. 2023) 63 F.4th 783, 790, 797 (*Yim*) [referencing such ordinances in Berkeley, Oakland, San Francisco, Ann Arbor, Seattle, Detroit, Portland, Minneapolis, Cook County, Washington, D.C., and New Jersey].)

Further, as the Ninth Circuit Court of Appeals explained in evaluating one such housing ordinance in Seattle, "In the United States, people of color are significantly more likely to have a criminal history than their white counterparts.  Discriminatory law enforcement practices have resulted in people of color being 'arrested, convicted and incarcerated at rates [that are] disproportionate to their share of the general population.'  [Fn. omitted.]  [¶] . . . [¶]  The correlation between race and criminal history can result in both unintentional and intentional discrimination on the part of landlords who take account of criminal history.  A landlord with a policy of not renting to tenants with a criminal history might not bear any racial animus, but the policy could nevertheless disproportionately exclude people of color.  On the flip side, a landlord who does not wish to

20

rent to non-white tenants could mask discriminatory intent with a 'policy' of declining to rent to tenants with a criminal history." (*Yim*, *supra*, 63 F.4th at pp. 788–789; see *Mandala v. NTT Data, Inc.* (2d Cir. 2020) 975 F.3d 202, 220 (*Mandala*) (dis. opn. of Chin, J.) ["As scholars and the EEOC have recognized, criminal history screens can have a substantial adverse disparate impact based on race"].)

A duty to conduct criminal background checks on all rideshare passengers would raise similar concerns about overbreadth, the disproportionate exclusion of certain racial groups, and the masking of discriminatory intent. The risk of invidious discrimination would be a particular concern if Lyft's obligation was to exclude passengers based on an ill-defined category of having a "serious" criminal history, or if individual drivers were tasked with making their own risk assessments based on minimal information about a passenger's criminal history. Indeed, in areas such as employment, the racially disproportionate impact of the use of criminal background checks as a screening tool has led to governmental scrutiny and litigation against some private companies. (See *Mandala*, *supra*, 975 F.3d at p. 217, fn. 3 (dis. opn. of Chin, J.) [collecting cases in which courts denied motions to dismiss claims challenging criminal background checks as having an unlawful disparate impact based on race]; see generally *EEOC v. Freeman* (D.Md. 2013) 961 F.Supp.2d 783; *EEOC v. Peoplemark, Inc.* (W.D.Mich. Mar. 31, 2011, No. 1:08-cv-907) 2011 WL 1707281.) Requiring Lyft to conduct criminal background checks on every passenger seeking to use the service would be inconsistent with public policies moving away from generalized, non-specific use of

21

criminal history as a means of excluding individuals.[5]  (See *Ann M.*, *supra*, 6 Cal.4th at p. 679 [burden of providing security patrols included that the obligation was not well-defined].)

An obligation to conduct criminal background checks on every potential passenger would additionally raise concerns regarding consumer privacy, another area in which the Legislature has enacted laws to restrict, rather than expand, the use of consumer information.  The Legislature enacted ICRAA out of concern for consumer privacy and the increasing risks of identity theft.  (Civ. Code, § 1786.)  Civil Code section 1786.12 enumerates the specific, limited circumstances in which an investigating consumer reporting agency may furnish an "investigative consumer report."[6]  Further, a report may not include records of conviction that antedate the report by more

---

[5]  We do not suggest that using a rideshare service is equal in importance to obtaining employment or housing.  However, the public policies underlying recent laws and ordinances aimed at restricting the use of criminal background checks are relevant as they appear to reflect a growing concern about the undesirable effects of excluding individuals from participating in aspects of society based on criminal history alone.

[6]  Although ICRAA does not use the term "criminal background check," the parties and the trial court appeared to assume the background checks Al Shikha proposed would constitute "investigative consumer reports."  We have no reason to question this assumption.  (See *Kemp v. Superior Court* (2022) 86 Cal.App.5th 981, 992 [a conviction touches on a person's character and credit worthiness and therefore is subject to regulation under ICRAA]; Pub. Util. Code, § 5445.2, subd. (c)(1) [regarding criminal background checks for drivers; an "investigative consumer report" may be furnished for a driver].)

than seven years, and it may not include expunged convictions or arrests that did not result in a conviction. (Civ. Code, § 1786.18, subd. (a)(7).)

The parties dispute whether ICRAA would prohibit Lyft from obtaining criminal history reports about passengers. Lyft asserts the law allows such reports only in the statute's limited, enumerated circumstances. (Civ. Code, § 1786.12.) Al Shikha argues Lyft could simply include a provision in the Lyft terms of service requiring passengers to consent to criminal background checks, thus complying with Civil Code section 1786.12, subdivision (c), which allows reports to be furnished "[i]n accordance with the written instructions of the consumer to whom it relates." We need not resolve the dispute here. Even if not prohibited by ICRAA, imposing an obligation on Lyft to conduct criminal background checks on a vast number of individuals, as a condition of engaging in an activity akin to hailing a taxi, would significantly implicate the law's underlying concerns related to consumer privacy, relevancy, and confidentiality. (Civ. Code, § 1786, subds. (b) & (f).)

The measures Al Shikha proposes would thus create potential liability for Lyft related to privacy concerns and disparate impact. In addition, like the landlords in *Castaneda*, Lyft similarly would face potential liability for personal injuries if it is alleged to have failed to conduct a sufficiently searching inquiry, misjudged a passenger's record as not constituting a "serious" criminal history if that passenger later engaged in violence, or failed to conduct sufficiently frequent background checks on repeat riders. (*Castaneda*, *supra*, 41 Cal.4th at p. 1217.) This potential liability is illustrated by the litigation rideshare companies have faced from passengers alleging the

23

companies failed to obtain sufficiently thorough criminal background checks on drivers. (E.g., *Doe v. Uber Technologies, Inc.* (N.D.Cal. 2016) 184 F.Supp.3d 774, 788 [negligent hiring claim of plaintiff sexually assaulted by driver; court found plaintiff sufficiently alleged Uber was negligent in part because a criminal background check did not capture the driver's prior assault conviction]; see Schoenbaum, *Gender and the Sharing Economy* (2016) 43 Fordham Urb. L.J. 1023, 1061 (hereafter Schoenbaum) [noting criticism of ridesharing firms for incomplete background checks after finding drivers with criminal histories].)

Moreover, the *Castaneda* court's skepticism regarding the effectiveness of screening based on criminal records remains applicable here. In addition to the concerns the *Castaneda* court identified—that juvenile records would likely not be included, and adult records do not necessarily reflect the circumstances of past crimes sufficient to reliably allow a defendant to determine whether an individual poses a threat of a specific type of violence—criticisms have also been levied that some forms of criminal background checks are frequently incomplete and inaccurate. (E.g., *Herring v. U.S.* (2009) 555 U.S. 135, 155 (dis. opn. of Ginsburg, J.) [noting risk of error stemming from criminal records databases "is not slim," and amici "warn[ed] that law enforcement databases are insufficiently monitored and often out of date"]; *Henderson v. Source for Public Data, L.P.* (4th Cir. 2022) 53 F.4th 110 [plaintiffs sued data company for including inaccurate and misleading information in criminal background check reports]; Schoenbaum, *supra*, 43 Fordham Urb. L.J. at p. 1061; Logan & Ferguson, *Policing Criminal Justice Data* (2016) 101 Minn. L.Rev. 541, 559–563 [describing widespread problems with criminal history records containing inaccurate and

incomplete information; leading to private sector companies issuing reports with errors such as mismatched reports, reporting expunged records, incomplete dispositions; private reports "are known to present significant risk of mismatching individuals to records"].)  Not only may incorrect reports be ineffective in screening out passengers likely to commit violence, Lyft could face liability for inaccurate screenings, both from drivers harmed and potentially from customers denied rides based on incorrect information.  Finally, Lyft points out that the rideshare platform allows users to obtain rides for other individuals and to share rides.  The criminal background check procedure Al Shikha proposes would miss such additional passengers altogether.

In short, construing Lyft's duty to drivers to include an obligation to conduct a criminal background check on all riders, for the purpose of excluding some subset of them based on their criminal histories, is an extremely burdensome precautionary measure.

### 2. Al Shikha has not established heightened foreseeability

Al Shikha has not established the heightened foreseeability necessary for the imposition of such a duty.  In determining whether a plaintiff has made a showing of heightened foreseeability, courts have considered whether there were prior similar incidents of violent crime (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1150 (*Wiener*); *Ann M.*, *supra*, 6 Cal.4th at p. 679), or whether the defendant had actual knowledge of the perpetrator's violent propensities (*Hanouchian*, *supra*, 51 Cal.App.5th at pp. 112–113; *Margaret W. v. Kelley R.* (2006) 139 Cal.App.4th 141, 153, 158 [no showing of foreseeability where defendant did not know the plaintiff's

assailants and no evidence the assailants had propensity to commit sexual assaults]).

Al Shikha's complaint alleges only that "it is well known by Lyft that many drivers for Lyft and Uber, as well as taxicab drivers and other similar common carriers, have fallen victim to serious crimes committed by passengers in the years prior to the Incident . . . ." This allegation does not reflect a heightened foreseeability that passengers will perpetrate violence on drivers in particular. As the California Supreme Court explained in *Wiener*, "it is difficult if not impossible in today's society to predict when a criminal might strike. Also, if a criminal decides on a particular goal or victim, it is extremely difficult to remove his every means for achieving that goal." (*Wiener*, *supra*, 32 Cal.4th at p. 1150.) That passenger crime against drivers has occurred, standing alone, is insufficient to demonstrate heightened foreseeability. (See *Sharon P.*, *supra*, 21 Cal.4th at p. 1191; *Hanouchian*, *supra*, 51 Cal.App.5th at p. 113.)

On appeal, Al Shikha contends the heightened foreseeability of riders perpetrating crime on drivers is demonstrated by the fact that Lyft "dedicates many sections of its website and much of its policies and rules to driver/safety issues"; that Lyft "has a dedicated team of Safety Specialists who track and respond to reports of crimes committed during rides"; and by Lyft's Community Safety Report, which Al Shikha contends reported 10 fatal physical assaults in the years 2017 to 2019, and 4,158 sexual assaults, in data that does not indicate whether the victims were riders or drivers.

As noted above, Al Shikha did not present these documents to the trial court, and we have concluded there is no basis for us to take judicial notice of the materials. Yet, even if these were

26

facts alleged in Al Shikha's complaint, we would conclude they do not establish heightened foreseeability of the type of attack that occurred in this case. An allegation that Lyft has policies regarding safety issues and has a team to respond to reports of crime indicates nothing about prior incidents similar to the attack in this case. Similarly, an allegation of 10 fatal physical assaults in a three-year period and over an unknown number of rides, or 4,158 sexual assaults when it is unknown how many of the victims were drivers, fails to establish the kind of "extraordinary foreseeability" necessary for the imposition of the extremely burdensome and questionably effective crime prevention measures Al Shikha proposes. (*Sharon P.*, *supra*, 21 Cal.4th at p. 1199; *Ann M.*, *supra*, 6 Cal.4th at p. 679.)

Al Shikha additionally argues data from Uber safety reports demonstrates the foreseeability of passenger attacks on drivers similar to this case. He cites *Tchakounte v. Uber Technologies, Inc.* (D.Md., Feb. 3, 2022, No. CCB-20-3028) 2022 WL 326727 (*Tchakounte*), in which the plaintiffs presented an Uber safety report indicating that for the years 2017 and 2018, "[Uber] drivers experienced fatal violence almost as frequently as riders did." (*Id*. at p. *2.) Yet, Al Shikha ignores that the *Tchakounte* court concluded the safety report data was insufficient to establish foreseeability in that case. The court explained: "Assuming the Safety Report shows Uber was aware of fatal assaults on drivers at the time of Mr. Tchakounte's murder, the risk of a fatal injury was extremely low: 7 of the 750,000 Uber drivers in 2018 (0.00093%) experienced a fatal assault. This falls far short of analogs in other tort liability contexts, where courts have looked for relatively higher incidences of harm before finding harm foreseeable. [Citation.] To find that Uber should

27

have foreseen such a low-probability event would be to hold Uber liable as an insurer of its drivers' safety." (*Id.* at p. *7, fns. omitted.)

Al Shikha also relies on *Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425. *Tarasoff* concerned a therapist whose patient confided that he intended to kill a particular person and the duty the therapist owed to that person. The court held that a therapist who determines a patient poses a serious risk of violence to another has a legal duty to warn the potential victim or others of the specific threat. (*Id.* at p. 431.) The court's ruling was limited to a therapist with knowledge of a specific threat; it did not hold that therapists must screen all clients for potential threats. The court explained that the plaintiffs' complaint alleged the defendants predicted the patient would kill the victim and they were negligent in failing to warn of the danger. The duty Al Shikha proposes is much broader than that in *Tarasoff* and it concerns a far more generic and less foreseeable harm.

Al Shikha's reliance on *Duffy v. City of Oceanside* (1986) 179 Cal.App.3d 666 (*Duffy*), is similarly misplaced. In *Duffy*, the court held that a city had a duty to warn its employee that another employee (Larroque) was a parolee who had served time in prison for kidnapping, rape, and sexual assault. (*Id.* at p. 669.) The victim had informed the city that Larroque was sexually harassing her, yet the city did not warn her of his relevant criminal history. (*Id.* at p. 675.) Larroque subsequently kidnapped and killed the victim. (*Id.* at p. 669.) These specific facts created a triable issue as to negligence. (*Id.* at p. 675.)

However, the court explicitly refused to impose a broad duty, explaining that "[w]ere the substance of plaintiffs'

complaint simply that the City was obliged to warn all female employees who might come in contact with Larroque of his prior criminal conduct, we would be unpersuaded. . . . The mere fact that Larroque had been convicted of assaults on two women at least seven years earlier—for which he had served time in prison and been treated in a mental hospital—gives rise to an insufficiently strong inference that he would repeat similar criminal behavior. Balanced against this are the negative effects of a warning to fellow employees."[7] (*Duffy*, *supra*, 179 Cal.App.3d at p. 674.)

As the California Supreme Court recognized over 30 years ago, "Unfortunately, random, violent crime is endemic in today's society. It is difficult, if not impossible, to envision any locale open to the public where the occurrence of violent crime seems improbable." (*Ann M.*, *supra*, 6 Cal.4th at p. 678.) Al Shikha's

---

[7] The court elaborated on these "negative effects": "Not only would such a warning have caused perhaps unnecessary anxiety for those warned but, more importantly, knowledge of Larroque's past by his co-workers might have prejudiced any chance he had to lead a normal life. Even if such a warning did not cause his fellow employees to ostracize Larroque, he would have been 'different' and treated accordingly. There is a serious danger that a warning will become a self-fulfilling prophecy, stigmatizing the parolee and causing him to be reminded he is not normal. [Citation.] We thus do not say that the decision to employ a parolee does not involve any risk but only that the benefits to be gained by warning of that risk do not outweigh the burdens thereby engendered." (*Duffy*, *supra*, 179 Cal.App.3d at p. 674.) Those burdens are also relevant here. (See *Tchakounte*, *supra*, 2022 WL 326727, at p. *9 [duty to screen all rideshare passengers would carry significant implications for formerly incarcerated people's participation in society].)

complaint identifies nothing about Lyft's operations or the individuals who use the service that indicates a heightened foreseeability that riders will engage in unprovoked attacks on drivers. Nothing in the complaint alleges or suggests the risk of an attack is higher during a rideshare ride than in any other setting in which strangers interact. (*Verdugo*, *supra*, 59 Cal.4th at p. 340 [that occasional incidents of sudden cardiac arrest may have occurred at Target stores would not demonstrate heightened foreseeability; complaint did not identify any risk that such occurrence was greater at Target than any other location open to public].) "[A] general knowledge of the *possibility* of violent criminal conduct is not in itself enough to create a duty under California law . . . ." (*Williams*, *supra*, 37 Cal.App.5th at p. 668.) We conclude as the court did in *Castaneda* that "[g]iven the extraordinarily burdensome nature of the duty plaintiff seeks to impose and its likely social cost, . . . much greater foreseeability than that demonstrated here would be required to recognize the duty" to obtain criminal background reports on all passengers. (*Castaneda*, *supra*, 41 Cal.4th at p. 1218.)

B. **Setting aside the heightened foreseeability test, the *Rowland* factors still support a limitation of the duty**

Al Shikha also relies on the California Supreme Court's decision in *Regents* to support his arguments. Although *Regents* involved third party criminal conduct, the court did not expressly employ the sliding scale, heightened foreseeability analysis. Yet, the framework described in *Regents* similarly leads to the conclusion that the *Rowland* factors weigh in favor of limiting the

duty Lyft owes drivers to exclude an obligation to conduct criminal background checks on all passengers.[8]

In *Regents*, our Supreme Court considered whether the University of California was negligent for failing to adopt measures to protect a student who was stabbed during class by another student with known mental health issues. The court considered each *Rowland* factor individually and concluded the university had a duty of care to protect its students from foreseeable violence during curricular activities. (*Regents*, *supra*, 4 Cal.5th at p. 613.)

The *Regents* court explained the foreseeability inquiry was not whether the particular student's injury was reasonably foreseeable in light of the prior conduct of the specific student who injured her, but "whether a reasonable university could foresee that its negligent failure to control a potentially violent student, or to warn students who were foreseeable targets of his ire, could result in harm to one of those students." (*Regents*, *supra*, 4 Cal.5th at p. 629.) The court then considered examples of violent attacks at other universities and concluded, "particularly after the Virginia Tech shootings focused national attention on the issue, colleges have been alert to the possibility that students, particularly those with mental health issues, may lash out violently against those around them." (*Id*. at p. 630.)

---

[8]     We note that the sliding-scale balancing test essentially considers both (1) the *Rowland* foreseeability factors and (2) the policy factors of preventing future harm and the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach.

Taken at a similar level of generality, the question presented here is whether a reasonable rideshare company could foresee that its failure to perform criminal background checks on all passengers could result in a passenger harming a driver. Al Shikha's complaint sufficiently alleges that passengers have committed crimes against Lyft drivers prior to this incident, thus that such attacks may happen is reasonably foreseeable. Yet, it is far less clear that such attacks are a foreseeable consequence of Lyft failing to conduct criminal background checks on all potential passengers. There is no allegation, for example, that it is passengers with "serious" criminal histories, or prior convictions enumerated in Public Utilities Code section 5445.2 or Business and Professions Code section 7458, who have committed crimes against drivers in the past. Indeed, while we consider foreseeability at a general level rather than based on the facts of this particular case, it is not clear from the complaint's allegations that Alvarez had a "serious criminal history," or prior convictions that would disqualify a person from driving for a TNC.

This case thus stands in contrast to those in which courts have found " ' "the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed . . . ." ' [Citations.]" (*Regents*, *supra*, 4 Cal.5th at p. 629.) In *Regents*, for example, the court considered situations in which a university is on notice about a particular student's potential to be violent, or a student's mental illness that may predispose the student to commit a violent act. Here, Al Shikha does not allege the obligation to conduct criminal background checks arises out of any knowledge or awareness about particular passengers, that passengers with

32

certain criminal histories are predisposed or more likely to commit violent acts against drivers, or that Lyft is on notice of anything other than that passengers have committed crimes against drivers. This falls far short of the foreseeability present in *Regents*.

Similarly, in *Brown v. USA Taekwondo* (2019) 40 Cal.App.5th 1077, affirmed in part by *Brown*, *supra*, 11 Cal.5th 204, the court found sexual abuse was a foreseeable harm arising out of the failure of a national governing body for an Olympic sport to implement or enforce any policies to protect athletes from such abuse. The plaintiffs' complaint alleged that in the years prior to the incidents underlying the complaint, sexual abuse of young athletes by coaches was so rampant that the organization had purchased insurance to cover coach sexual abuse. A national team coach was caught having sex with a young female athlete. And, on two prior occasions, athletes were raped at an Olympic training center. (*Brown v. USA Taekwondo*, at p. 1097.)

Here, there are no similar allegations that relate to the category of negligent conduct at issue—the failure to obtain criminal histories of potential riders and to exclude riders with criminal backgrounds from using Lyft. As one court reasoned in the context of an unprovoked school shooting by a teacher's spouse, " 'It is undeniable that shootings and other forms of violence can and do happen in the workplace [and on school grounds]. But for foreseeability in the context of a duty to protect, "[m]ore than a mere possibility of occurrence is required since, with hindsight, everything is foreseeable." ' [Citation.] This case presented nothing more than a ' "mere possibility of occurrence." ' [Citation.]" (*C.I. v. San Bernardino City Unified School Dist.* (2022) 82 Cal.App.5th 974, 985 (*C.I.*).)

The second foreseeability factor, "the degree of certainty that the plaintiff suffered injury" (*Rowland*, *supra*, 69 Cal.2d at p. 113), is not at issue here.  It is undisputed Al Shikha suffered harm from Alvarez's attack.  (*Regents*, *supra*, 4 Cal.5th at p. 630; *Kuciemba*, *supra*, 14 Cal.5th at p. 1023 [this factor does not apply to personal injury claims that are tangible].)

The third foreseeability factor is " 'the *closeness of the connection* between the defendant's conduct and the injury suffered.' [Citation.]"  (*Regents*, *supra*, 4 Cal.5th at p. 630, citing *Rowland*, *supra*, 69 Cal.2d at p. 113.)  The factor concerns whether there is a "causal nexus" between the defendant's conduct and the injury suffered.  (*C.I.*, *supra*, 82 Cal.App.5th at p. 986.)  This prong is " 'strongly related to the question of foreseeability itself' "; however, unlike the foreseeability consideration it " 'accounts for [the] third party' " conduct.  (*Kuciemba*, *supra*, 14 Cal.5th at p. 1023.)  If " 'the third party's intervening conduct is foreseeable or derivative of the defendant's, then that conduct does not " 'diminish the closeness of the connection between the defendant['s] conduct and plaintiff's injury.' " ' [Citations.]"  (*Id.* at pp. 1023–1024; *Regents*, at p. 631 [when the immediate cause of injury is a third party's conduct, " 'the touchstone of the analysis is the foreseeability of that intervening conduct' "].)  In *Regents*, the court found a causal connection between a university's failure to warn or protect foreseeable victims once the school is on notice that a student is at risk to commit violence, and the injuries a victim suffers as a result of that violence.  (*Regents*, at p. 631.)

In contrast, here there is minimal causal nexus between Lyft's failure to obtain background checks on all potential passengers and a passenger perpetrating violence against a

driver. As the court explained in *Castaneda*, the utility of criminal background checks in identifying those likely to commit violence is limited and questionable. (*Castaneda*, *supra*, 41 Cal.4th at p. 1217.) Criminal background check reports on every prospective rider would not necessarily provide information from which either Lyft or individual drivers could reliably decide whether a potential passenger poses a threat of violence to the driver.

*Doe v. United States Youth Soccer Association, Inc.* (2017) 8 Cal.App.5th 1118 (*Doe*), thus provides a helpful contrast.[9] In *Doe*, the plaintiff alleged the defendant youth soccer associations and soccer league were negligent in failing to conduct criminal background checks on youth soccer coaches. A youth coach sexually abused the plaintiff, a 12-year-old soccer player, and the categorical harm alleged was coaches' sexual abuse of youth soccer players. (*Id.* at pp. 1123, 1136.) The Court of Appeal reasoned that a criminal background check would have revealed the offending coach's prior conviction for domestic violence, so he likely would not have been hired. The background check would

---

[9] Although the *Doe* court applied the sliding-scale balancing test and found the complaint did not establish heightened foreseeability, the court nonetheless concluded the sexual abuse of youth soccer players by coaches was reasonably foreseeable. The court therefore considered the other *Rowland* factors. The court also determined that conducting criminal background checks on youth soccer coaches would not be overly burdensome. Other youth soccer organizations were already conducting such criminal background checks and, pursuant to Penal Code section 11105.3, the defendant organizations could obtain criminal background checks in California for free. (*Doe*, *supra*, 8 Cal.App.5th at p. 1136.)

therefore have prevented the abuse of the plaintiff. (*Id.* at pp. 1136–1137.) The connection between the plaintiff's harm and the defendants' failure to conduct a criminal background check was close.

The sexual abuse of youth soccer players was also a foreseeable harm resulting from the defendants' failure to screen the criminal backgrounds of coaches in light of the defendants' awareness of the steady annual rate of incidents of physical and sexual abuse of youth soccer players; the defendants' awareness that "sexual predators were drawn to their organization in order to exploit children"; and because the founder of the defendant league was charged with multiple felony child molestation offenses the year before the offending coach applied for a position with the league. (*Doe, supra,* 8 Cal.App.5th at p. 1135; see *id.* at pp. 1126, 1132–1133.)

Here, the complaint does not allege that individuals likely to commit unprovoked violent assaults are drawn in particular to rideshare services, or that prior violent incidents involved individuals with any particular type of criminal record, or a criminal record at all. Even considering the facts of this case, Al Shikha has not alleged that Alvarez had a criminal history that involved assaultive or violent conduct. Unlike the sexual abuse of the *Doe* plaintiff, the injury suffered here is "connected only distantly and indirectly" to Lyft's alleged negligent acts. (*Regents, supra,* 4 Cal.5th at p. 630.) The *Rowland* foreseeability factors do not weigh in favor of recognizing a duty to conduct criminal background checks on all riders.

Whether considering the question of duty under the sliding-scale balancing framework described in *Verdugo* and other prior cases, or as explained in *Regents*, the answer here is the same. Al

Shikha's complaint failed to allege facts demonstrating the type of harm he suffered was highly foreseeable, or that the failure to conduct criminal background checks on all passengers is sufficiently likely to result in a violent, unprovoked attack on a driver, such that liability may be imposed. "Given that '[f]oreseeability and the extent of the burden to the defendant are ordinarily' considered the 'crucial' considerations in evaluating legal duty (*Castaneda*, *supra*, 41 Cal.4th at p. 1213), it is unnecessary here to separately review the remaining *Rowland* factors. [Citation.]" (*Williams*, *supra*, 37 Cal.App.5th at p. 673; *Kuciemba*, *supra*, 14 Cal.5th at p. 1025 [the policy factors serve to assess whether, *despite* the foreseeability factors weighing in favor of recognizing a duty of care, public policy requires a different result]; *Hanouchian*, *supra*, 51 Cal.App.5th at pp. 113–114.)

## DISPOSITION

The judgment is affirmed.  Lyft is awarded its costs on appeal.

**CERTIFIED FOR PUBLICATION**

ADAMS, J.

We concur:

EDMON, P. J.

EGERTON, J.